**GILES et al. v. McKANNA et al.**

No. 9608.

Court of Civil Appeals of Texas. Austin.

Feb. 19, 1947.

Rehearing Denied March 12, 1947.

Grover Sellers, former Atty. Gen., Wm. J. Fanning, of Austin, and Woodrow Edwards, of Sulphur Springs, former Sp. Asst. Attys. Gen., Price Daniel, present Atty. Gen., and F. D. Brown and Ben H. Rice, III, present Asst. Attys. Gen., and Scott Gaines, of Austin, for appellants.

J. B. Robertson and Dan Moody, both of Austin, for appellees.

HUGHES, Justice.

Appellees, Edwin A and Eileen A. McKanna, sued the Commissioner of the General Land Office and the members of the Board for Lease of University Lands, appellants, in their official capacities, to enjoin the threatened cancellation of an oil and gas lease, which appellees own, and for a declaratory judgment establishing the present validity of such lease.

Appellants filed a plea in abatement, alleging that this suit was in reality against the State, and the State not having given its consent to be sued, was not maintainable; and, in the alternative, that if the suit not be against the State, then the State was an indispensable party. Appellants, subject to the plea in abatement, filed an answer and cross-action, alleging facts claimed to authorize cancellation of the lease, and for which they affirmatively prayed.

Judgment, as prayed for by appellees, was decreed by the trial court, from which this appeal is taken.

The facts were stipulated, and in substance show:

On September 30, 1924, an oil and gas permit was issued covering certain described lands in Pecos County. While this oil and gas permit was issued to the predecessors in title of appellees, this opinion will be written as if appellees were the original permittees and lessees since they have acquired all of the rights under said permit and the subsequent lease.

On December 23, 1928, gas was found in commercial quantities on the lands covered by such permit.

On January 3, 1929, the then Commissioner of the General Land Office issued a lease, the pertinent provisions of which are:

"For and in consideration of the premises aforesaid, and the obligations hereinafter named, the State of Texas, acting by and through J. T. Robison, Commissioner of the General Land Office of the State of Texas, under the laws of said State, does hereby grant and lease * * * for such period of time as the hereinbefore described areas produce oil or gas in paying quantities * * *.

"If * * * the owners of this lease * * * fail or refuse to proceed in good faith and in a bona fide effort to develop, operate and put out the petroleum or gas at any time during the life of this lease * * *, this lease shall be subject to forfeiture."

Gas was actually produced from said lands in commercial quantities from December 13, 1929, to August 1932, since which latter date no gas has been produced for the reason that there has been no available market for the gas.

On September 20, 1934, the Board of Regents of the University of Texas and the Board for Lease of University Lands entered into an agreement with appellees that the above lease should be continued in force for a period not to exceed five years from September 1, 1934, and that the producing gas well thereon should maintain the same as to the lands described therein, "in full force and effect for said term of five years without further drilling or development by the lessee, except to protect offsets wells and until marketing conditions opened up so as to enable lessee to market its gas."

At the time of the issuance of the oil and gas permit, the law provided that a lease covering the lands described in such permit might be obtained in the following manner: "2. Upon the payment of two dollars per acre for each acre in the permit a lease shall be issued for a term of ten years or less, as may be desired by the applicant, and with the option of a renewal or renewals for an equal or shorter period, and annually after the expiration of the first year after the date of the lease the sum of two dollars per acre shall be paid during the life of the lease, and in addition thereto the owner of the lease shall pay a sum of money equal to a royalty of one-eighth of the value of the gross production of petroleum. The owner of a gas well shall pay a royalty of one-tenth of the value of the meter output of all gas disposed of off the premises." Subd. 2, Sec. 7, Chap. 83, pp. 158, 160, General Laws 1917, 35th Legislature, Regular Session.

Sec. 19 of this said Act, in part, provides: " * * * should the owner of a lease fail or refuse to proceed in good faith and with reasonable diligence and in a bona fide effort to develop, operate and put out the mineral or other substance at any time during the life of the lease, * * * the * * * lease * * * shall be subject to forfeiture * * *."

At the time of the issuance of the above lease the oil and gas permit laws pertaining to University lands had been amended, either by specific legislative act or by the Re-codification of 1925, in the following particulars applicable to this case:

Sec. 1 of Art. 5343, R.S.1925, provided, in part: " * * * provided, oil and gas permits and leases outstanding, shall not be affected by this Act except as provided in Section 14 hereof."

Sec. 14, as amended and superseded by the Acts of 1925, 39th Legislature, Chap. 143, Sec. 1, which now appears as Art. 5341b, R.S.1925, reads as follows: "All oil and gas permits heretofore or hereafter issued upon lands included herein and which have not expired shall be extended for a term of five years from date thereof, conditioned only upon the payment of the annual rental, as provided by law, in advance and whenever production is secured in paying quantities and the payment of royalty begins, the owner shall not pay any further annual rental money. After production is secured in paying quantities, the owner shall be entitled to a lease which shall run so long as the area covered by his lease produces oil or gas in paying quantities, subject to the provisions of this Act."

The above-quoted portion of Sec. 19, Chap. 83, General Laws, 35th Legislature, was omitted in the 1925 Re-codification of the Civil Statutes.

It is appellees' position that that portion of Chap. 83 of the General Laws of the 35th Legislature providing that the lease should be forfeited in the event lessee fails or refuses in good faith and with reasonable diligence to put out the mineral or other substance during the life of the lease became part of such lease, particularly since similar language was written into the lease itself, and that this provision controls and extends the provision that the lease should run only so long as oil or gas is produced in paying quantities.

Appellees did not accept a lease under the provisions of the permit law which were in existence at the time of the issuance of such permit. If they had they would only have obtained a lease for a period of ten years or less, with the option of a renewal or renewals for an equal or shorter period of time. The laws having been amended before the issuance of the lease to appellees, they accepted a lease under the laws which then provided that the lease should run so long as the area covered by the lease produces oil or gas in paying quantities. Evidently appellees considered such a lease to be more beneficial than a lease for the limited term prescribed under the laws in existence at the time the permit was issued. At any rate, we need not determine what the rights of appellees would have been if they had taken the lease for the term authorized by the controlling statutes as of the date of the issuance of their mineral permit, because no such lease was issued.

█ We are further of the opinion that the provision of the 1917 Act that a lease was subject to forfeiture in event that lessee should fail or refuse to put out the mineral or other substance at any time during the life of the lease with reasonable diligence and in good faith is referable to and controlled by the specific term for which the lease could be issued under such Act; and that such provision, even if properly incorporated in appellees' lease, is controlled by the specific term for which such lease could properly be issued under the 1925 Act, to-wit, as long as the area covered by the lease produced oil or gas in paying quantities.

█ The lease in question providing that it should run only so long as the area covered produced oil or gas in paying quantities, and it appearing that appellees' lease had not produced gas in paying quantities, or in any other quantity, for more than twelve years prior to the institution of their suit, it follows as a matter of law that such lease had terminated when this suit was brought.

In Watson **v.** Rochmill, 137 Tex. 565, 155 S.W.2d 783, 784, 137 A.L.R. 1032, this point was expressly determined, Judge Alexander using this language: "It appears to be very well settled that under the terms of the lease, upon cessation of production after termination of the primary term, the lease automatically terminated. W. T. Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W.2d 27. The strictness of the above rule has been modified where there is only a temporary cessation of production due to sudden stoppage of the well or some mechanical breakdown of the equipment used in connection therewith, or the like. Under such circumstances there are authorities which hold that the lessee is entitled to a reasonable time in which to remedy the defect and resume production. Scarborough v. New Domain Oil & Gas Co., Tex.Civ.App., 276 S.W. 331; Texas Pacific Coal & Oil Co. v. Bratton, Tex.Civ.App., 239 S.W. 688. In the case at bar, however, the cessation of production was not merely a temporary one. There was no production for a period of two years and seven months. The cessation of production for this long period of time was not brought about nor induced by any mechanical breakdown or other condition in connection with the well or the equipment used in connection therewith. The demoralized condition of the oil market and the low gravity of the oil in no wise prevented the operation of the well by the lessee for whatever oil it would produce. These conditions may have rendered it unprofitable to operate the well, but were not contracted against and consequently they did not prevent a lapsation of the lease when production ceased."

It is true that the lease in question had no primary term, but under the mineral permit law in effect when their lease was issued appellees were given a certain period of time within which to prospect for oil and gas, and upon securing production became entitled to a lease. Under such circumstances a primary term would have been useless and senseless.

That the lease in question may be capable of producing gas is beside the point. The parties have agreed that the lease should continue in force only so long as oil or gas was produced in paying quantities. There is a marked difference between the capacity to produce in paying quantities and actual production in paying quantities.

In the case of Stanolind Oil & Gas Co. v. Barnhill, Tex.Civ.App., 107 S.W.2d 746, 749 (writ ref.), the court had under consideration this very question. In holding that the lease terminated and that the failure to find a market did not extend the life of the lease, the court said: "The lease under which appellant holds provides that it shall remain in force for a term of five years from its date, and so long thereafter as oil or gas, or either of them, is produced in paying quantities. Under the above definition of the term employed by the parties in the contract, appellants, although they discovered gas to an extent and in quantity that would have complied with their obligation in the lease if a market had been available for the kind of gas discovered, did not, under the circumstances of this case, discover nor produce gas in such quantities as, under the law, would be 'paying quantities,' within the five years provided by the lease. Their estate, consisting of a determinable fee, determinable upon their failure to produce oil or gas in paying quantities within such term, came to an end on February 4, 1935, as found by the trial court, after which they did not possess any interest whatever in the land. The lease did not exist. The term had closed, and the interest they procured by the lease was gone. It is not a question of forfeiture for failure to continue to develop the land, nor does it rest upon any other contingency. Appellants did not contract for a term which would depend upon the possibility of procuring a market for the product at some date subsequent to its express date of expiration. The lease did not provide that it should remain in force and effect for five years, and as long thereafter as there may be prospects of a market for the product, and it is not the duty of the courts to make contracts for parties but only to construe such contracts as they make for themselves."

The extension agreement made on the 20th of September, 1934, between the Board of Regents, the Board for Lease, and the appellees, was based on the purported authority of the following statute: "Whenever in the discretion of the Board for Lease of University Lands it is for the best interest of the University Permanent Fund to prorate, reduce or discontinue production on any of the University oil and gas leases by agreement with lessees for a limited period, said Board shall have and is hereby given authority to execute the necessary contract to carry out the intention of this section." Sub. (d), Sec. 5, Chap. 174, Acts of the Regular Session, 42nd Legislature, Vernon's Ann.Civ.St. art. 2603a, § 8(d).

On the date of this agreement no gas had been produced from the lands covered by appellees' lease for more than two years. There was, therefore, at such time no production to prorate; no production to reduce; and no production to discontinue. There was simply no production; for which reason this agreement was without authority of law.

We also hold that said agreement was ineffective to extend the lease until "marketing conditions opened up so as to enable lessee to market its gas." The five-year term granted by the extension agreement expired September 20, 1939. This was a limited period within the meaning of such statute, but the agreement to extend the lease until marketing conditions opened up, if as appellees contend is in addition to the five-year period, was without authority of law, because an extension upon such conditions and for such length of time would not be a limited period as authorized by such statute. "Limited" is defined as within limits; narrow; circumscribed. Webster's Dictionary.

It has been more than twelve years since gas was produced, during which no market has been found, and there is nothing in the record to indicate when, if ever, a market will be found. This portion of the agreement is, therefore, too indefinite and vague and without such limitation as to constitute an agreement for a "limited period"

Under this extension agreement certain small payments were made to the Land Commissioner in lieu of royalties. These payments were made without legal obligation on the part of appellees and were accepted by the Land Commissioner without lawful authority, and the acceptance of the same does not bind the State. State v. Robison, 119 Tex. 302, 30 S.W.2d 292.

These conclusions make unnecessary the consideration of appellants' plea in abatement.

The judgment of the trial court is reversed and judgment is here rendered for appellants canceling appellees' lease.

Reversed and rendered.