E. L. REID, Appellant,

v.

GULF OIL CORPORATION, Appellee.

No. 6144.

Court of Civil Appeals of Texas.

Beaumont.

Feb. 5, 1959.

Amended Motion for Rehearing Denied
April 15, 1959.

E. L. Reid, S. P. Dunn, Orange, for appellant.

John E. Bailey and Fred A. Lange, Houston, for appellee.

ANDERSON, Chief Justice.

We are called upon to construe an oil, gas and mineral lease and to determine whether it lapsed for want of production after expiration of its primary term or is still in force as a result of drilling operations, and discovery of gas in paying quantities, a tender of "shut-in" gas royalties, and the commercial production of gas, commenced after an interim of several months during which the gas well was shut in.

In pertinent part, the lease—one of the "unless" type—is as follows:

"2. Subject to the other provisions herein contained, this lease shall be for a term of Five (5) years from this date (called primary term) and as long thereafter as oil, gas or other mineral is produced from said land hereunder, or as long as drilling or reworking operations are being conducted on said land as is hereinafter provided.

"3. The royalties to be paid by Lessee are: (a) on oil, * * *; (b) on gas * * produced from said land and sold or used off the premises or in manufacture of gasoline or other product therefrom, the market value * * * of one-eighth of the gas sold or used, * * *; where gas from a well producing gas only is not sold or used, Lessee may pay as royalty Fifty Dollars ($50.00) per well per year, and upon such payment it will be considered that gas is being produced within the meaning of Paragraph 2 hereof; * * *.

 * * * * * *

"5. If, during the primary term and prior to the discovery of any mineral on said land, Lessee should drill a dry·hole thereon, this Lease shall not terminate if Lessee * * *. If a dry hole is completed and abandoned during the last period of the primary term, Lessee's rights * * *. After the discovery of any mineral in paying quantities on the land, all of Lessee's rights shall remain in effect as long as any mineral is produced therefrom; and if, during the primary term, the production of all minerals therefrom should cease from any cause, this lease shall not terminate if Lessee * * *. If cessation of production occurs at any time after the expiration of the primary term, then this lease shall not terminate if Lessee, until production is again procured, does not allow more than sixty (60) days to elapse between the

cessation of production and the commencement of additional drilling or reworking operations in a bona fide effort to again obtain production, and successive attempts may be made so long as not more than sixty (60) days are allowed to elapse between the completion or abandonment of one well and the commencement of operations on another until production is again obtained. If at the expiration of the primary term, oil, gas or other mineral is not being produced from the land then covered hereby, but Lessee is then engaged in operations for drilling or reworking operations on some part of the land hereunder, this lease shall not terminate if Lessee does not allow more than sixty (60) days to elapse between the abandonment of one well and the commencement of drilling or reworking operations on another until production is obtained."

The lease was executed by appellant Reid in favor of appellee under date of December 9, 1943, and covered one-eighth of the minerals in two tracts of land in Orange County. It was kept in force during its primary term by payment of delay rentals, but no mining operations of any kind were conducted under it until November 29, 1948, which was but a few days before its primary term was to expire with December 9, 1948.

On November 29, 1948, in search of oil or gas, appellee began drilling a well on land covered by the lease. Drilling continued until December 23, 1948, when a depth of 8700 feet had been reached. Perforations were then made at a depth between 8360 and 8382 feet, and gas was discovered. The task of cementing and casing the well was completed December 30, 1948, and the drilling rig was thereupon released. Testing equipment was moved in and testing began January 9, 1949. Between then and January 15, 1949, from 1,500,000 to 5,000,000 cubic feet of gas flowed from the well. The gas was run through a portable separator on the premises and was then flared. An undisclosed

quantity of condensate was extracted from the gas, but the dispositon that was made of it is not reflected by the record. On January 15, 1949, the well was shut in as a well capable of producing gas in paying quantities. On January 18, 1949, to comply with a rule of the Railroad Commission, the well's bottom-hole pressure was tested. Thereafter, until November 22, 1949, the well was kept shut in continuously. On the latter date, which appellee claims was the first time at which there was an available market for gas from the well, the well was put into commercial production and it was still producing gas in paying quantities when the case was tried.

Nothing by way of drilling or reworking, nor anything else of a manual nature, was done relative to the well between January 18, 1949, and the time at which the well was connected to the gathering system on or just prior to November 22, 1949. But on February 15, 1949, appellee delivered to appellant a check for $25 (the correct amount) as payment of shut-in royalty on the well for one year from January 15, 1949, the date on which the well was shut in preceding the bottom-hole-pressure test. Appellant did not cash the check but did keep it until April 13, 1949. He mailed the check back to appellee on the latter date but made no express claim in his letter of transmittal that the lease had terminated. The same check was again delivered to appellant by appellee on May 23, 1949, and was again returned by appellant to appellee the following day. Even then, however, appellant did not expressly represent to appellee that the lease had terminated. And it was not until March 29, 1950, that he did so, following submission to him by appellee of a division order which he declined to sign. But his failure to assert his true position earlier is of no real importance, since neither waiver nor estoppel is an issue in the case.

Letters that were exchanged by the parties are likewise of no importance, and for the same reason; but it is not amiss to

state that appellant was rather fully advised about the nature and potential of the well, the prospects for marketing gas from the well, and the steps appellee had taken and was taking to market such gas. He was given such information before he returned the check the first time and he thereafter was kept advised of developments.

Sales of gas from the well on and after November 22, 1949, were to United Gas Pipe Line Company. They were made under a written contract bearing date of June 7, 1949. But the contract appears to have been the culmination of negotiations begun late in 1948 and of oral agreements reached prior to February 22, 1949. It covered sales of gas from the entire field in which the subject well was situated; and after it had been entered into, it was necessary for United to install a gathering system for the field.

Appellant instituted this suit in 1953, seeking to have it decreed that the lease terminated under its own provisions not later than January 18, 1949. He also prayed for recovery of title to and possession of an undivided one-eighth interest in the minerals in the lands described in the lease, for an accounting, and for recovery of one-eighth of the net value of the well's production—a value of $624,156.60 as of September 30, 1956. Alternatively he prayed for recovery of royalties due him under the lease.

The case was tried before the court, without the intervention of a jury. Trial began on October 30, 1956. Judgment was rendered on April 9, 1957. The lease was adjudged to be still in force, and appellant was awarded judgment for only the royalties due him under the lease, computed as of September 30, 1956—an aggregate of $9,752.53.

Findings of fact and conclusions of law were filed at the instance of appellant.

The fact findings have been rather fully paraphrased already, but we think it well to state with certainty that there were specific findings: that the well "produced gas" between January 9 and 18, 1949; that the well "is a well producing gas only"; that gas from the well "was not sold or used by lessee until November 22, 1949." There was also a finding that from prior to the time at which it began drilling the well until it entered into the sales contract on June 7, 1949, appellee "was at all times acting in good faith and was at all times diligent and active in attempting to secure a purchaser for the gas it had discovered in the North Port Neches Field in which the subject well is located." There was the further finding that "the only available market for the gas from the subject well when it was completed was with United Gas Pipe Line Company in the North Port Neches Field in which said well is located." And then there were these findings which we think it best to set out in their entirety:

"(11) In the North Port Neches Field where the subject well is situated, the marketing of gas is done by the field and not by the well, and gas could not be marketed and produced from the subject lease until United Gas Pipe Line Company had completed its field gathering system to take deliveries of the gas from the wells in the field, including the subject well, and Gulf exercised good faith and due diligence in finding a market for the gas and in expediting the completion of United's facilities as early as possible in order that deliveries could commence.

"(12) The time interval between January 15, 1949, when the subject well was finally completed as a well capable of producing gas in paying quantities, and November 22, 1949, when actual gas deliveries from said well commenced to United Gas Pipe Line Company, the purchaser of said gas, was a reasonable time between discovery and the marketing of the production from the subject lease, under all the facts and circumstances present in this case.

"(13) * * *

"(14) No time being specified in the lease as to the date that shut-in royalty payments should be made, the time interval between January 18, 1949 and February 15, 1949 was a reasonable time under all the facts and circumstances for such payment."

Only two conclusions of law, as such, were included. One was that the mineral lease in question "is in full force and effect and binding upon the mineral interest of said E. L. Reid in the lands described in said mineral lease." The other was that the plaintiff "is only entitled to recover * * * the royalty accrued to his interest or credit in the production from the subject well under the terms and provisions of said mineral lease."

After the original findings and conclusions had been filed, "additional and amended findings" were specially requested by appellant and. were made. They were these:

"1. There was no actual production from the well drilled by the defendent until November 22, 1949.

"2. The defendant only discovered gas and condensate.

"3. Plaintiff has not ratified, adopted or recognized the lease from him to defendant as being in effect since defendant completed its well and is not estopped from urging that said lease has terminated."

It may be that the second of the "additional and amended findings" is entitled to be construed as though it read: "The defendant only discovered, *did not produce,* gas and condensate." If so, both it and the first of such findings no doubt have some semblance of being in conflict with the original finding that the well "produced gas" between, January 9 and 18, 1949. But we are satisfied that there is only the semblance and not the reality of conflict.

The evidence conclusively established that considerable quantities of gas did in fact flow from the well between January 9 and 18, 1949. But it just as conclusively established that such gas was not sold or used and that the well was not put into commercial production and did not produce marketable gas prior to November 22, 1949. Therefore, the original finding was no doubt intended as a finding that *in a physical sense* the well "produced gas" between January 9 and 18, 1949; and the "additional and amended findings" were intended as findings that until November 22, 1949, there was no "actual production" from the well in the sense contemplated by the contracting parties. The findings will be given effect accordingly.

Not only the judgment but the conclusions of law, and also fact findings eleven, twelve, and fourteen, are attacked by appellant. Findings twelve and fourteen are said to be without support in the evidence. In the alternative, they are said to be so against the overwhelming weight and preponderance of the evidence as to be clearly wrong. They are then dissected and further challenged. For example, to the extent that it constitutes a finding that by implication the lease accorded to appellee a reasonable time after discovery within which to commence producing and marketing gas from the well, the twelfth finding is specially challenged. And to the extent that it is itself a finding that the lease did not specify when, in order to be efficacious, payment or tender of shut-in royalty was to be made, or is a finding that by implication the lease accorded to appellee a reasonable time after shutting in the well for payment or tender of shut-in royalty, the fourteenth finding is likewise specially challenged. The eleventh finding is only attacked upon the ground that it is so against the overwhelming weight and preponderance of the evidence as to be clearly wrong. The judgment and the conclusions of law are challenged generally, as being erroneous on the undisputed facts. Additionally, some of their possible implications are singled out and specially challenged.

In its turn, by cross point, appellee challenges the first of the "additional and

amended findings" as being without support in the evidence.

Appellant urges, as a basic proposition, that following completion of the well as one capable of producing gas in paying quantities, the primary term of the lease having theretofore expired, the lease could be kept in force only by production, either actual or constructive, and could survive no gap between completion of the well and commencement of production. And he follows through by urging that there was a fatal gap between completion of the well and commencement of production, it being his position that there was no semblance of constructive production until the shut-in royalty was tendered to him on February 15, 1949, which was some thirty days after the well had been shut in, and no actual production until more than ten months had elapsed. He also urges, if we correctly understand him, that the tender of shut-in royalty could have been effective only in the event it had been made not later than the time at which appellee shut in the well.

Appellee counters with a variety of contentions. It urges, for example, that the tender of shut-in royalty was not necessary to keep the lease in force during such time after completion of the well, not exceeding a year, as was reasonably necessary for appellee to secure a market for the gas and commence production, that under its implied terms the lease remained in force during that period anyway. Alternatively appellee contends that it tendered the shut-in royalty in ample time, that by implication the lease accorded to it a year, or at least sixty days, or in any event a lesser reasonable time from the shut-in date in which to pay or tender such royalty and thereby keep the lease in effect.

More than ten consecutive months during which there was neither actual production nor drilling nor reworking operations under the lease having elapsed after the primary term of the lease had expired, the lease lapsed unless the tender of shut-in royalty was timely made. The fact that there was no available market for gas from the well at the time did not in law excuse the lack of production. Stanolind Oil & Gas Co. v. Barnhill, Tex. Civ.App., 107 S.W.2d 746, er. ref.; Cox v. Miller, Tex.Civ.App., 184 S.W.2d 323, er. ref.; Giles v. McKanna, Tex.Civ.App., 200 S.W.2d 709, er. ref., n. r. e.; Watson v. Rochmill, 137 Tex. 565, 155 S.W.2d 783. And appellee offered no other excuse for its failure during so long a period of time to put the well into production. In order for drilling or reworking operations to have kept the lease in force, it at least would have been necessary that they be prosecuted in good faith and with due diligence, the circumstances considered, if not that they be prosecuted with no cessation of more than sixty consecutive days. 31A Tex.Jur. 269—Oil and Gas, sec. 155. In neither event were they so prosecuted.

In considering whether the tender of shut-in royalty was timely, we must first determine the standard by which the matter is to be judged, for the lease does not expressly supply one.

The ultimate test, no doubt, is that of whether the lease was still in force when the tender was made, because neither actual nor constructive production revives a lapsed lease. Freeman v. Magnolia Petroleum Co., 141 Tex. 274, 171 S.W.2d 339, 342, and the cases therein cited. But the question immediately arises as to whether the lease impliedly provided that it was to remain in force during some period of time for the special purpose of enabling appellee to pay or tender shut-in royalty. We think it did not and that the matter of whether the lease was still in force is to be decided without regard to the shut-in-royalty provision. By this we mean that for present purposes no distinction is to be drawn between actual production and the constructive production contemplated by the shut-in-royalty provision of the lease, and that the true criterion for determining whether the tender of shut-in royalty was

timely is that of whether actual production would itself have been timely if begun when the tender was first made.

■■ When it is considered that constructive production does not begin until shut-in royalty is actually paid or tendered, Freeman v. Magnolia Petroleum Co., 141 Tex. 274, 171 S.W.2d 339, 341; that the lease imposed no duty on appellee to pay shut-in royalty; and that the constructive production that results from payment or tender of shut-in royalty under a shut-in-royalty provision of the kind here involved does no more, at most, than take the place of actual production, we perceive no sound basis for assuming that the contracting parties intended that different time limits for commencement of the respective types of production were to prevail. Moreover, we are of the opinion that the case last above cited, Freeman v. Magnolia Petroleum Co., as well as others that could be cited, precludes any holding that some period of time in which to pay or tender shut-in royalty was specially granted, as an isolated matter, by the lease. Quite definitely, for example, the case precludes, at least by necessary implication, any holding that the lease impliedly accorded to appellee a year from the shut-in date in which to pay or tender such royalty. And we are convinced that it just as surely precludes a holding that by implication the lease specially and as an isolated matter accorded to appellee a reasonable time from the shut-in date in which to pay or tender the royalty. If there were an implied provision of the lease specially granting appellee a reasonable time from the shut-in date in which to pay or tender shut-in royalty, it undoubtedly would be as applicable in a situation where a well is completed (to the capping stage, that is; that being the only sense in which either "completed" or "completion" is used in this opinion) during the waning hours of the primary term of a lease as in a situation where a well is completed after expiration of the primary term. We are satisfied that

such a provision could not be implied in the former situation to prolong the life of the lease beyond the end of the primary term, and so we conclude that none such can be read into the lease at all.

■ In final analysis, of course, the conclusions just expressed with reference to the reasonable-time doctrine are based in the belief that the lease contains no implied provision by which its life was prolonged a reasonable time after completion of the well to enable appellee to put the well into actual production. And, as intimated, this belief is rooted in the conviction that the reasonable-time doctrine cannot be applied with like force and fairness both to wells completed during the primary term and to wells completed after expiration of the primary term and is therefore not to be applied at all. The lease's implied provisions are as much a part of it as its express provisions are, and have been a part of it from its inception. Freeport Sulphur Co. v. American Sulphur Royalty Co., 117 Tex. 439, 6 S.W.2d 1039, 60 A.L.R. 890. Necessarily, therefore, they must be applied indiscriminately in comparable situations. With reference to the matter now being considered, a well that is completed after the end of the primary term is not believed to present a different situation from that that is presented by a well that is completed during the primary term; and we are convinced that principles of law which are settled beyond question rule out any chance that the reasonable-time doctrine could be invoked to prolong the life of the lease beyond the end of the primary term if the well with which we are concerned had been completed during the primary term. The lease was to remain in force during the primary term "and as long thereafter as oil, gas or other mineral is produced." Conversely, it was to lapse at the end of the primary term in the absence of production. In Freeman v. Magnolia Petroleum Co., 141 Tex. 274, 171 S.W.2d 339, 342, it was said of a similar provision: "Here the parties agreed that

if no gas was being produced on April 7, 1940, the lease should terminate." No implication contrary to the clear language of the lease or to the clear intendment of the parties as evidenced by the lease can be imputed to the lease. Freeport Sulphur Co. v. American Sulphur Royalty Co., 117 Tex. 439, 6. S.W.2d 1039, 1043, 60 A.L.R. 890; Gulf Production Co. v. Kishi, 129 Tex. 487, 103 S.W.2d 965, 968.

There are cases, it is true, in which it has been assumed that the reasonable-time doctrine is applicable, among them: Bain v. Strance, Tex.Civ.App., 256 S.W.2d 208, 210; Cowden v. General Crude Oil Co., Tex.Civ.App., 217 S.W.2d 109; Union Oil Company of California v. Ogden, Tex.Civ. App., 278 S.W.2d 246, 249; Cox v. Miller, Tex.Civ.App., 184 S.W.2d 323; Texas Pacific Coal & Oil Co. v. Bratton, Tex.Civ.App., 239 S.W. 688. But none of those cases is believed to have turned on the proposition, and none that necessarily has done so has come to our attention. Such expressions relative to the subject as appear in the cases are therefore thought to be but dicta which should not be followed, the authorities heretofore cited considered. And this view is believed to be largely confirmed by Holchak v. Clark, Tex.Civ. App., 284 S.W.2d 399, 402, error refused, and by Sellers v. Breidenbach, Tex.Civ. App., 300 S.W.2d 178, error refused.

■ The reasonable-time doctrine being inapplicable, only the provisions of the lease appertaining to drilling and reworking operations can have served to keep the lease in force until the shut-in royalty was tendered. And we think they cannot have done so unless something classifiable as drilling or reworking operations remained to be done—or was in order—after the well was shut in. It is necessary, therefore, that we first decide whether the things it was still necessary for appellee to do if the well was to be put into production— viz., connect the well to a pipe line and extend the line to some point where gas could be marketed—are classifiable either as drilling operations or as reworking operations, within the reference of the lease. In fact, it is perhaps necessary that we decide whether they are classifiable as drilling operations. We hold that they are.

It may be—though there is no affirmative evidence to that effect—that drilling operations are not normally thought of, either inside or outside the oil and gas industry, as embracing the installation of marketing facilities, but we are nonetheless of the opinion that, as used in the lease, the term "drilling operations" was intended to embrace all of the physical and mechanical aspects of bringing about the production of oil or gas in paying quantities. A pipe line was as essential to production in the circumstances as was the casing that was placed in the well itself. "Unlike oil, gas cannot be produced and stored. In order that it may have a value, there must exist pipe lines through which it may be marketed." Hanks v. Magnolia Petroleum Co., Tex.Com.App., 24 S.W.2d 5, wherein the cost of installing a pipe line was treated as an item to be considered in determining whether a well was capable of producing gas in paying quantities.

■ Production was the prime objective of the parties to the lease, and the terms of the lease should be construed in the light of that objective. Moreover, one of the very purposes of the drilling provision under consideration was to enable appellee to preserve the lease and realize on its own investment, in the event drilling operations extending beyond the end of the primary term should result in the discovery of oil or gas in paying quantities. Of necessity, therefore, the parties contemplated and intended that in such circumstances appellee was to have an opportunity to do the things reasonably necessary to bring about production. Yet they did not expressly allow for the doing of anything not encompassed by "drilling or reworking operations." We are therefore impelled to the conclusion that the term

"drilling operations" was intended to have the broad meaning we have indicated, because the parties are presumed to have known, and to have executed the lease knowing, that the reasonable-time doctrine would not be available to bridge a gap between the capping stage and the production stage in a well's progress. 10A Tex. Jur. 389—Contracts, sec. 192, but only in support of the proposition that the law is a part of the contract. It would be idle to argue that the term was intended to embrace nothing more than the mere cutting of hole; and once past that point, there would seem to be no justification for excluding from its meaning any intervening step necessary to ultimate production. See, as a case somewhat in point, Morrison v. Swaim, Tex.Civ.App., 220 S.W.2d 493.

Coming now to the matter of whether, by virtue of its provisions appertaining to drilling and reworking operations, the lease was in fact still in force when the shut-in royalty was tendered, we are of the opinion that only paragraph two and the last sentence of paragraph five of the lease can have any application to the facts of the case. Appellee contends that the next to the last sentence of paragraph five is also applicable and that it served to keep the lease in force for sixty days from the date on which the well was shut in, but we are of the contrary opinion. The sentence provides: "If cessation of production occurs at any time after the expiration of the primary term, then this lease shall not terminate if Lessee * * * does not allow more than sixty (60) days to elapse between cessation of production and commencement of additional drilling or reworking operations * * *." Appellee argues that, within contemplation of the provision, there was production from the well between January 9 and 15, 1949, and cessation of production on January 15, but we cannot concede as much. Wherever used in the lease, the word "production," also the word "produced," is used in the same sense. It refers to production in pay-

ing quantities. Garcia v. King, 139 Tex. 578, 164 S.W.2d 509; Cox v. Miller, Tex. Civ.App., 184 S.W.2d 323, 327. It has also been said to mean "marketable oil or gas." Rogers v. Osborn, 152 Tex. 540, 261 S.W.2d 311, 312; Holchak v. Clark, Tex.Civ.App., 284 S.W.2d 399, error refused. Under neither definition—if in fact they differ—did the uncaptured gas that was produced and flared between January 9 and 15, 1949, amount to production, within contemplation of the lease. Moreover, since the gas was not sold or used, it did not, by the very terms of the lease, amount to production. Freeman v. Magnolia Petroleum Co., 141 Tex. 274, 171 S.W.2d 339, 342. And since it must be held that production, in the sense contemplated, did not commence prior to either January 15 or 18, 1949, it must also be held that there was no cessation of production on either day, within contemplation of the lease. Rogers v. Osborn, 152 Tex. 540, 261 S.W.2d 311, 313. Furthermore, we think the provision clearly contemplates cessation of production that has served to support the lease, and appellee in effect concedes that the production between January 9 and 15, 1949, had not served that purpose and could not have done so.

Altering, for the moment, the general trend of the discussion, we hold at this point that, construed as we have construed it, the first of the "additional and amended findings"—the finding that there was "no actual production" from the well until November 22, 1949—is not only supported but was required by the evidence. Additional support for the holding should not be necessary, but we nonetheless call attention to those cases in which it has been specifically held that neither discovery of oil or gas in paying quantities nor a well's established capacity to produce oil or gas in paying quantities is the equivalent of production— among them: Holchak v. Clark, Tex.Civ. App., 284 S.W.2d 399, er. ref.; Sellers v. Breidenbach, Tex.Civ.App., 300 S.W.2d 178, er. ref.; Cox v. Miller, Tex.Civ.App., 184 S.W.2d 323, er. ref.; Freeman v. Magnolia Petroleum Co., 141 Tex. 274, 171 S.W.2d

339. It follows, of course, that appellee's single cross point is overruled.

By the terms of its paragraph two, the lease was to remain in force as long after expiration of its primary term "as drilling or reworking operations are conducted on said land as is hereinafter provided." The last sentence of paragraph five of the lease —which, for the sake of convenience and clarity, we bring forward—is as follows: "If at the expiration of the primary term, oil, gas or other mineral is not being produced from the land covered hereby, but Lessee is then engaged in operations for drilling or reworking operations on some part of the land hereunder, this lease shall not terminate if Lessee does not allow more than sixty (60) days to elapse between the abandonment of one well and the commencement of drilling or reworking operations on another until production is obtained."

 Between them, the two provisions undoubtedly served to keep the lease in force so long as drilling operations were prosecuted with due diligence. And we think it may be accepted that upon cessation of drilling operations the lease did not immediately terminate, subject to being revived only by a resumption of operations, but continued in full force during whatever period of time appellee was at liberty to resume such operations or to begin reworking operations. Stanolind Oil & Gas Co. v. Newman Brothers Drill. Co., Tex., 305 S.W.2d 169, 173; Shell Oil Co. v. Goodroe, Tex.Civ.App., 197 S.W.2d 395. Therefore, if the shut-in royalty was tendered during that period of time, the tender was timely. But the period of time during which appellee was at liberty to suspend or to resume operations is not itself certain.

 If it is proper to construe the sentence of the lease last above quoted as though it read, "the lease shall remain in force so long as drilling or reworking operations are prosecuted with no cessation of more than sixty days," then the parties have prescribed a standard of diligence for the prosecution of such operations, and the lease remained in effect for sixty days after drilling operations were suspended. Stanolind Oil & Gas Co. v. Newman Brothers Drill. Co., Tex., 305 S.W.2d 169, 173. But if the sentence is not to be so construed, then appellee was required to prosecute the operations with due diligence, measured by common-law standards, 31A Tex.Jur. 269— Oil and Gas, sec. 155. And in that event, the matter of whether appellee failed to prosecute the operations with due diligence is primarily a question of fact which was not decided by the trial court.

 Although less assured of the correctness of our position than we should like to be, we have concluded that the sentence should be denied the construction above mentioned. Preservation of the lease between abandonment of one well after expiration of the primary term and commencement of operations on another is obviously the paramount purpose, if not the only one, the sentence was designed to serve. And the sixty-day proviso is, in our opinion, too intimately interwoven with that purpose to be segregated from it and applied in a situation in which, as here, no abandonment of a well is involved. This is not to deny that the sentence may have been intended to supplement paragraph two of the lease in respects other than with reference to an abandoned well, but to the extent that such was its purpose, we think it should be construed as though it merely read: "If, at the expiration of the primary term, oil, gas or other mineral is not being produced from the land then covered hereby, but Lessee is then engaged in operations for drilling or reworking operations on some part of the land hereunder, this lease shall not terminate so long as said operations shall continue." We hold, therefore, that in order to keep the lease in force by drilling operations after its primary term had expired, it was necessary for appellee to prosecute the operations with due diligence, measured by common-law standards.

As previously indicated, the fact findings of the trial court include no finding to the effect that prior to tendering the shut-in royalty appellee had failed to prosecute the drilling operations with due diligence. But we are not at liberty in the circumstances to presume in favor of the judgment a finding to the effect that appellee had not so failed. Instead, we must appraise the judgment in the light of the findings that were actually made. Rule 299, Texas Rules of Civil Procedure. And when this is done, it is apparent that the judgment can only have been based upon one or more of the legal theories hereinabove discussed and rejected. Of course, if the findings were sufficient to support the judgment under any applicable legal principle, the judgment would still have to be affirmed. Hanks v. Magnolia Petroleum Co., Tex.Com.App., 24 S.W.2d 5, 7, and the cases therein cited. But we are of the opinion that they are not. The judgment must therefore be reversed. However, we think it would be improper in the circumstances to render judgment in favor of appellant, for there is reason to suppose that the facts relative to the controlling question in the case have not been fully developed.

Although we consider fact findings eleven, twelve and fourteen immaterial, we nonetheless make these rulings with reference to them: The eleventh finding is supported by the evidence and is not so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong. There is no relevant evidence of probative force to support the twelfth finding. But if we are in error in holding irrelevant matters which the trial court obviously took into consideration in making the finding, then the finding is supported by the evidence and should not be disturbed. All things considered, we are not disposed to disturb that part of the fourteenth finding that pertains to reasonable time, though more pertinent evidence no doubt could have been produced. The finding is perhaps otherwise more a conclusion of law than a finding of fact. It is correct to the extent that it means that the lease did not expressly provide a time for payment of shut-in royalty; incorrect if it means that the lease did not indirectly and by implication control time of payment.

For the reasons assigned, the judgment of the trial court is reversed and the cause is remanded for a new trial.

## On Motion for Rehearing

HIGHTOWER, Justice (dissenting).

Both parties have filed their motions for rehearing in this case. I have respectfully concluded that I cannot now fully agree with the majority of the court. The appellant's contentions should be sustained.

With no reservations whatever, I concur with those findings and conclusions of the majority that tend to defeat the lease. However, under the facts of this case, I cannot agree that the lease did not lapse prior to the payment of shut-in royalty thirty days subsequent to completion of the well.

One of the purposes of the shut-in royalty clause in oil and gas leases is to provide for the precise situation that existed in this case. The innovation was necessitated by the problem, recurring frequently in the oil world, when a well capable of producing gas in paying quantities was completed successfully at a time when there was no market or demand for its product, or when negotiations were still in progress for a contract leading to the marketing of such product. As the gas could not be stored, the Lessor would then be entitled to contend that the lease had terminated by virtue of the automatic operation of the habendum clause as a clause of special limitation. The courts thus were presented with resulting different fact situations; in this instance (again) a lessee faced with financial hardship and, confronted at the same time with accepted legal principles and theories opposed to his receiving aid. Many of the courts which had these problems before them and have held that the lease had terminated because of

 

such failure of production prior, or subsequent, to the expiration of its primary term mentioned that *the lease contract did not provide for the contingency that gas wells might be developed which would be unproductive for want of a market;* while courts in other jurisdictions avoided that result by rewriting, in effect, the lease contract, or by giving such a strained construction to the language of the leases that their judgments were incompatible with the actual terms of the lease. *The next logical step was the inclusion in leases of a shut-in gas royalty clause designed to remedy these undesirable results in advance.* See 24 Tex.Law Review, p. 478, by A. W. Walker, Jr.; 9th Annual Institute on Oil & Gas Law, p. 1, by James E. Sperling.

Of course, a part of the last sentence only of paragraph 5 is pertinent. In the Osborn case, with reference to the same part of such sentence it is said: "This sentence means that if production results from the continuous prosecution of the very operations being engaged in by the lessees upon the expiration of the primary term, the lease is good." [152 Tex. 540, 261 S.W.2d 315.] To this I would now add: Providing lessees tender the shut-in royalty payment prior to cessation of such operations resulting in production. '

But it is clear from the record as a whole that nothing was done from and after the time the well was shut in as a producer that could be classified as drilling operations. Certainly the thirty day slumber by the appellee, prior to tendering the shut-in royalty check, cannot be so classified. Nor can awaiting the installation of a pipeline and gathering system, at the convenience of some third party (United Gas Pipeline), be so classified. To do so is to completely disregard the great weight of Texas authority to the contrary.

The lease lapsed. Both parties were experienced in oil and gas operations, but to put it succinctly the appellee "slipped up". To paraphrase the Freeman case: If appellee had wanted to prevent lapsation of the lease for non-production, it could easily have done so by paying the twenty-five dollars on or before the last day on which the well was shut in as a producer. It could have met the condition which it imposed upon itself when it accepted the conditions of the lease. For its failure to do so it has only itself to blame. The lease lapsed as a matter of law when it so failed, and could not be revived by the attempt to perform the condition thirty days after the contract said it should be performed.

It being my opinion that the case was fully developed on trial on appropriate theories, I would accordingly reverse the judgment of the trial court and here render it in appellant's favor.