

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

**NO. 2-07-100-CV**

AFE OIL AND GAS, L.L.C. AND                              APPELLANTS
EXPLO OIL, INC.

V.

CHARLES ARMENTROUT, SUSAN                               APPELLEES
ARMENTROUT GIRVIN, LYNN A.
MORRIS, SALLY NELMS, AND
BIRDS FORT LAKE, LTD.

------------

### FROM THE 48TH DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

Appellants AFE Oil and Gas, L.L.C. and Explo Oil, Inc. appeal from a

judgment in favor of Appellees Charles Armentrout, Susan Armentrout Girvin,

Lynn A. Morris, Sally Nelms, and Birds Fort Lake, Ltd. that a mineral lease had

---

[1]*See* TEX. R. APP. P. 47.4.

terminated. In two issues, Appellants argue that the evidence is legally and factually insufficient to support the jury's finding that the well at issue was not capable of producing gas when shut-in royalties were tendered. Because we hold that the evidence is legally and factually sufficient to support the jury's finding, we affirm the trial court's judgment.

## FACTS AND PROCEDURAL HISTORY

Appellees Armentrout, Girvin, Morris, and Nelms executed an oil, gas, and mineral lease with AFE in 1997. The lease covered approximately 120 acres of land in the formation known as the Barnett Shale. In February 2002, the same parties executed successor leases in favor of AFE. One of these leases covered a 40-acre tract, described as "Tract A"; the Armentrout No. 2 well had been drilled on this tract while the 1997 lease was in effect. This 2002 lease is the lease at issue on appeal. AFE assigned a working interest to Explo Oil. AFE also assigned an interest in the lease to Premium Resources II ("PRII") through an agreement under which PRII became the designated operator of the well and AFE maintained a portion of the working interest.

The lease originally had a primary term of one year; the lease stated that it would be in effect during the primary term "and as long thereafter as operations . . . are conducted upon said land with no cessation for more than

2

ninety (90) consecutive days."[2]  The term "operations" was defined as "drilling, testing, completing, reworking, recompleting, deepening, plugging back or repairing a well . . . in an endeavor to obtain production of oil, gas, sulphur or other minerals . . . whether or not in paying quantities."  The lease further provided that if the well was not actually producing by the end of the primary term or at any time thereafter, the well could be shut in for up to ninety consecutive days, and the lease would not terminate if, by the end of the ninety days, royalties (called "shut-in royalties") were paid to the lessors.[3]

On December 16, 2002, the parties executed an agreement to extend the primary term of the lease on the land on which the well was located.  This agreement stated that the lease would be in force until August 1, 2003, "and as long thereafter as oil, gas or other minerals are produced f[ro]m the [leased land] . . . , and as long as operations as prosecuted under the terms of the Lease."

---

[2]*See Ridge Oil Co., Inc. v. Guinn Investments, Inc.*, 148 S.W.3d 143, 158-160 (Tex. 2004) (discussing cases construing similar lease provisions and determining what sort of operations will serve to keep the lease in force).

[3]*See Reid v. Gulf Oil Corp.*, 323 S.W.2d 107, 113-14 (Tex. Civ. App.—Beaumont 1959, no writ), *aff'd*, 161 Tex. 51, 337 S.W.2d 267 (1960) (construing a mineral lease in which the payment of shut-in royalties could constitute constructive production so as to keep the lease in force).

PRII began operations on the well on July 30, 2003. In August 2003, the well was acid perforated, a technique used to stimulate production of a gas well. In October 2003, PRII and AFE tendered payment of shut-in royalties to Armentrout, Girvin, Morris, and Nelms, who rejected the payments.

Appellees subsequently brought suit against Appellant AFE seeking a declaratory judgment that the mineral leases they had executed with AFE had expired. They also sought to quiet title to the land covered by the leases. Appellee Birds Fort Lake, Ltd., successor-in-interest to the other Appellees, currently owns the lands covered by the leases; Appellant Explo Oil intervened because it had acquired from AFE an interest in the well covered by the leases. Appellees obtained a partial summary judgment that the 1997 lease had ended on its own terms, but the parties went to trial over the 2002 lease.

At trial, the parties contested the issue of and produced conflicting testimony on whether the well could produce natural gas at the time the shut-in royalties were paid. Appellants contended that the lease was extended when shut-in royalties were paid if the well was capable at that time of producing in any quantity. The trial court thus submitted this question to the jury: "Do you find that in October, 2003, the Armentrout No. 2 Well was not capable of producing gas?" The trial court instructed the jury that a well is not capable of producing gas if the well needs further work, repairs, or equipment in order to

4

produce gas. The jury sent a note to the trial judge asking, "[M]ust the gas be able to flow in order to be considered 'producible'?" The judge then submitted this supplemental instruction: "In response to your question, you are instructed that in order for a gas well to be 'capable of producing gas'; the gas must be able to flow." The jury found that the well was not capable of producing gas, and the trial court entered final judgment for Appellees.

## ANALYSIS

In Appellants' first issue, they argue that the evidence is legally insufficient to support the jury's finding that when shut-in royalties were tendered, the well was not capable of producing gas. We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact.[4] In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable fact-finder

---

[4] *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 362–63 (1960).

could and disregard evidence contrary to the finding unless a reasonable fact-finder could not.[5]  Anything more than a scintilla of evidence is legally sufficient to support the finding.[6]

A typical gas lease runs for a set period of time—the primary term—during which the lessee conducts the necessary operations to complete a producing, and hopefully profitable, well.[7]  At the end of the primary term, if the well is producing gas, then the lease typically extends indefinitely for as long as the well continues to produce.[8]  If the well is not producing gas at the end of the primary term, the lease will usually end automatically.[9]  To avoid

---

[5]*City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

[6]*Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996).

[7]*See Fox v. Thoreson*, 398 S.W.2d 88, 91 (Tex. 1966) ("A 'primary term' is . . . the period, typically five or ten years, during which a lease may be kept alive by a lessee by virtue of drilling operations or the payment of rentals, even though there is no production in paying quantities.")

[8]*See Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002) ("[A] typical habendum clause states that the lease lasts for a relatively short fixed term of years (primary term) and then 'as long thereafter as oil, gas or other mineral is produced' (secondary term).")

[9]*See Fox*, 398 S.W.2d at 91 ("A primary term is also a period of time at the end of which the estate granted will terminate but which estate may be extended by some other provision, usually one for production."); *see also Hydrocarbon Mgmt., Inc. v. Tracker Exploration, Inc.*, 861 S.W.2d 427, 432 (Tex. App.—Amarillo 1993, no writ) ("It is the rule that a lease may be kept alive after the primary term only by production in paying quantities, or a savings

forfeiture of the lease, most gas leases allow for the lease to be extended even if the well is not producing gas if shut-in royalties are paid *and* the well is actually capable of producing gas.[10] In other words, if further work on the well is required before the well will be capable of producing gas, then even paying shut-in royalties will not prevent the termination of the lease. The term "capable of production" has been held to mean capable of producing gas in paying quantities where the lease does not define the term.[11]

The February 1, 2002, lease, as amended, at issue in this case had a primary term that expired on August 1, 2003, but the lease could be continued in force for up to ninety consecutive days without actual production if operations were being conducted on the land[12] or if the well was capable of

---

clause, such as a shut-in gas well clause, drilling operations clause, or continuous operations clause.").

[10]*See Hydrocarbon*, 861 S.W.2d at 432 (noting that "for a well to be maintained by the payment of shut-in royalties, it must be capable of producing gas . . . at the time it is shut-in"); *see also Kidd v. Hoggett*, 331 S.W.2d 515, 519 (Tex. Civ. App.—San Antonio 1959, writ ref'd n.r.e.) ("Shut-in royalty payments excuse production only if the well is actually capable of producing gas in paying quantities.").

[11]*Garcia v. King*, 139 Tex. 578, 582, 164 S.W.2d 509, 511 (1942) (holding that, where a lease term was for ten years and "as long thereafter as oil, gas, and other minerals is produced from said land hereunder," "produced" meant "produced in paying quantities").

[12]*See, e.g., Reid*, 323 S.W.2d at 113 (holding, in construing similar lease provision, that drilling or reworking operations would keep the lease in force if

7

producing and was shut in for no more than ninety days. The well was shut in on August 5, 2003, and shut-in royalties were tendered to Appellees in October 2003. Appellants contend that the February 1, 2002, lease required capability of production but not in paying quantities, that "capable of production" in this case means that "gas will flow when [the well's] switch is turned on," and that the record conclusively establishes that the well was capable of production when the shut-in royalties were paid.

At trial, Appellees elicited testimony from several sources that a gas well in the Barnett Shale will not produce without a fracture stimulation ("frac"), a different procedure than acid perforation, and that the well at issue had not been "fraced" by the end of the primary term. The jury could have determined that Appellants did not successfully refute this allegation of scientific fact. Appellants elicited some favorable testimony from Sanford Dvorin, who was an officer and principal of AFE during the relevant time period, is still affiliated with AFE, and retained an interest in the well at the time of trial. Dvorin testified that the only way to get a known quantity of gas from the well was to perform a fracture stimulation of the shale; he made a similar statement in a letter,

the operations were prosecuted in good faith and with due diligence and with no cessation of more than sixty consecutive days); *but see Ridge Oil Co., Inc.*, 148 S.W.3d at 158-160 (discussing cases construing similar lease provisions and determining what sort of operations will serve to keep the lease in force).

8

admitted into evidence, that was written after the well had had an acid stimulation performed on it.  He further testified that with respect to this well, he would have had to hire a service company, frac the well, and do mechanical work on it to get the well to produce, all of which had to be done after October 2003.

Appellees' expert, Nick Steinsberger, testified that in August 2003, the well was acid perforated and swab tested and would not flow on its own after that and that the well was at that point incapable of producing.  Although he did testify that the operator report showed that some gas flowed in August 2003, in the context of his testimony, it is clear that his testimony was that he believed that the gas was $CO_2$, not natural gas.  Even without considering his testimony as to the content of the gas from the well, he reiterates throughout his testimony his belief that the well could not produce without being "fraced." He stated that all Barnett Shale wells are fracture stimulated.  Although Appellants' brief states that Steinsberger testified that a fracture stimulation was only required for *optimal* production, in fact Steinsberger testified that the well was not capable of producing a single McF[13] of gas without a fracture

---

[13]*See* Railroad Commission of Texas, Oil and Gas Division, Glossary of Oil and Gas Terms, http://www.rrc.state.tx.us/divisions/og/glossary.html (last visited Mar. 5, 2008) (defining "McF" as "[o]ne thousand cubic feet of natural gas measured at standard pressure and temperature conditions").

stimulation. He testified that prior to the November 20, 2004, frac job, the well was not capable of producing, that the well still could not produce a month after that frac, and on August 5 and in late October and November 2003, the well could not be turned on and begin to flow.

Further, in a letter from June 2004, Carlos Sandoval, president of Explo Oil, stated that the gas purchase contract on the well required gas samples and volume tests from the well and that "obviously" the purchaser could have neither until the well was "fraced." The jurors may have reasonably taken this sentence to mean that, in Sandoval's opinion at least, the well was not capable of producing as late as June 2004 because the well had not been "fraced" and the well therefore was not capable of producing when shut-in royalties were tendered.

Further, the jury could have determined that the testimony and evidence produced by Appellants was not as reliable as that from Appellees, or in any event was not any more definitive.[14] Randy Mosley, Appellants' expert, testified that there was no metering device on the well when it was shut in and

---

[14]*See Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 120 (Tex. 2000) (reviewing court must defer to the credibility determinations of the trier of fact); *Allstate Tex. Lloyds v. Mason*, 123 S.W.3d 690, 703 (Tex. App.—Fort Worth 2003, no pet.) ("With competing contentions supported by expert witnesses on both sides, the burden fell on the jury to determine which contention was more credible.").

that the estimates he gave at trial as to the production capability of the well were not based on any measurement of gas produced at the time the well was shut in. He further testified that when he visited the well site in August 2006, after a frac job had been completed, he had no information to identify the components of the gas the well produced on that date.

As for the reliability of Mosley's testimony, Steinsberger testified that he had completed "probably about a thousand wells in the last ten years" in the Barnett Shale. Mosley, on the other hand, testified he had experience with completing and overseeing only one gas well in the Barnett Shale. And on that well, he did not design the frac job, and even that well was fracture stimulated. Steinsberger testified that he has authored numerous papers about the completion technology in the Barnett Shale, in his belief more than anyone else on the topic, some of which were for the *Journal of Petroleum Technology*, an authoritative journal in the field. Mosley, on the other hand, testified that he has not written any articles on the Barnett Shale. The jury could have determined that Steinsberger's expertise made his testimony more credible with respect to gas wells in the Barnett Shale.[15]

---

[15]*See Turner*, 38 S.W.3d at 120; *Allstate Tex. Lloyds*, 123 S.W.3d at 703.

Further, Mosley's demeanor on the stand may have affected the jury's opinion of his testimony. The court sustained objections multiple times to Steinsberger's testimony as being nonresponsive and instructed him to "[b]e responsive to the question," but during Mosley's testimony, the court not only sustained several objections to Mosley's nonresponsiveness but admonished Mosley himself:

> THE COURT: And I'm going to instruct you, Mr. Mosley, to answer the question that you're asked.
>
> [MOSLEY]: All right.
>
> THE COURT: If you're not capable of doing that, in the future I'm going to recess the trial until the morning. Do you understand my instruction?
>
> [MOSLEY]: Yes, sir, I do.
>
> THE COURT: Then stop giving nonresponsive answers.
>
> [MOSLEY]: All right.
>
> THE COURT: Stop speaking over the interrogator, and stop directing the interrogator where to start his question at.

Only two questions later, Appellees' counsel once again objected to the nonresponsiveness of Mosley's answer, at which point the court excused the jury so that it could invite Appellants' counsel to "visit with" his witness, presumably to instruct him to be responsive to Appellees' questions. The court also admonished Mosley in front of the jury for making an extraneous comment,

12

telling Mosley, "[T]hat's not called for."  The jury could have determined from Mosley's demeanor that his testimony was not as credible as Steinsberger's testimony and that Appellants' evidence overall was not as credible as that of Appellees.

Considering evidence favorable to the finding if a reasonable fact-finder could and disregarding evidence contrary to the finding unless a reasonable fact-finder could not, we hold that the evidence at trial was at least some evidence that the well was not capable of producing at the time that the well was shut in and shut-in royalties were paid.  The evidence was therefore legally sufficient to support the jury's finding.  We overrule Appellants' first issue.

In Appellants' second issue, they argue that the evidence is factually insufficient to support the jury's verdict.  An assertion that the evidence is factually insufficient to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered.[16] We are required to consider all of the evidence in the case in making this determination, not just the evidence that supports the finding.[17]

---

[16]*Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

[17]*Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406-07 (Tex.), *cert. denied*, 525 U.S. 1017 (1998).

Appellants did present testimony contrary to the jury's verdict. Dvorin testified that there was a quantity of gas in the well in August 2003, that it was not true that the well never produced, and that he believed that they could produce the well. Mosley testified that he had determined that on August 6, 2003, the well was capable of producing and was capable of flowing gas without additional equipment or repairs. He estimated that the rate of production would be about 40 McF a day. He further testified that although he did not visit the well in August 2003, to some extent one can determine the physical condition of the well at that time based on records from that time of the pressure in the well. Mosley also testified that the acid perforation done on the well was sufficient pressure to break the formation and that in his opinion, if the well had been turned on in October 2003, it would flow, and the production would be natural gas, or at least a component of it would be. Steinsberger testified that if he had gone to the well in August 2003 and opened the valve, gas would have flowed and that in October or November 2003, the well flowed intermittently. Although he testified that, in his opinion, any gas was likely $CO_2$, the judge instructed the jury that there was no analysis in the record of whether the gas in the well was $CO_2$ or natural gas.

Finally, although the well operator's daily operations report for August 3, 2003, reported "no gas or very little," the report from August 5, 2003, stated

14

that the well was flowing and that there was "240 lbs casing pressure" before the well was shut in. The operations report listed 330 pounds of casing pressure on August 6, 2003, and 750 pounds of casing pressure on October 27, 2003.

Despite the conflicting testimony, as discussed above, the jury's finding is not so weak or the evidence to the contrary so overwhelming that the finding should be set aside. As discussed above, the jury could have reasonably determined that Appellants' evidence was not as credible as Appellees' evidence. We thus hold that the evidence was factually sufficient to support the jury's finding. We overrule Appellants' second issue.

## CONCLUSION

Having overruled both of Appellants' issues, we affirm the trial court's judgment.

LEE ANN DAUPHINOT
JUSTICE

PANEL B:  LIVINGSTON, DAUPHINOT, and WALKER, JJ.

DELIVERED:  March 6, 2008

15