GULF OIL CORPORATION V. E. L. REID.

No. A-7343. Decided March 23, 1960.
Rehearing Overruled July 20, 1960.
(337 S.W. 2d Series 267)

52

*Walter C. Clemons, John E. Bailey* and *Fred A. Lange,* all of Houston, for petitioner, Gulf Oil Corporation.

*E. L. Reid* and *S. P. Dunn,* both of Orange, for E. L. Reid.

MR. JUSTICE CULVER delivered the opinion of the Court.

The chief question presented here is whether the so-called "shut-in" royalty payment, tendered after a well capable of producing gas only in paying quantities had been capped, was so timely made as to extend the term of an oil and gas lease after the expiration of the primary term.

On December 9, 1943 E. L. Reid, who owned an undivided 1/8th mineral interest, executed to Gulf Oil Corporation an oil and gas lease for a primary term of five years. Gulf began the drilling of a well a few days before expiration of the primary term and continued drilling operations up to and including January 18, 1949, subsequent to the end of the primary term when the well in question was completed. This well, which was capable of production in paying quantities, was capped on that date due to the lack of market facilities. On February 19, 1949, Gulf tendered the "shut-in" gas royalty payment to Reid, which was rejected by him. On June 7, 1949, Gulf contracted with a pipe line company for the sale and purchase of the gas. On November 22, 1949, the gathering lines had been laid and connected, and thereafter until the date of the trial of this case the well has continued to produce in paying quantities.

This suit was filed by E. L. Reid seeking to have the Court decree that the lease terminated under its own provisions and for the recovery of title to and possession of his undivided 1/8th interest in the minerals, and for an accounting. The trial court denied the relief sought, and held the mineral lease to be in full force and effect. The Court of Civil Appeals reversed and remanded. 323 S.W. 2d 107. The applications for writ of error of both parties are before us. We will direct our attention first to that of Gulf Oil Corporation.

Petitioner asserts: (1) That it had a reasonable time to obtain a market for its gas from and after the completion of the well, (2) that inasmuch as no time was expressly provided within which the royalty must be paid, the only stated condition being that $50.00 be paid per well per year, by implication the lessee could pay the royalty at any time within the year following the "shut-in" of the well; (3) that there was actual production of gas within the terms of the lease; (4) that there was thereafter a cessation of production within the meaning of paragraph 5 of the lease so as to bring into play the 60-day cessation-of-production and thus keep the lease alive for a period of 60 days after the well was capped and production ceased: (5) that the lessee had the privilege of paying the "shut-in" royalty at any time so long as the lease was kept alive under any of its provi-

54

sions. We think the Court of Civil Appeals correctly resolved these issues against petitioner's contentions. The lease followed substantially the usual "unless" form.[1]

■ At the outset we will reiterate the following propositions that have been well established during the development of oil and gas law in this State. (1) An oil and gas lease such as the one we have before us created a determinable fee in the land which terminates upon the happening of the events upon which it is limited. Texas Co. v. Davis, 113 Texas 321, 254 S.W. 304; 255 S.W. 601; W. T. Waggoner Estate v. Sigler Oil Co., 118 Texas 509, 19 S.W. 2d 27; Stanolind Oil & Gas Co. v. Barnhill, Texas Civ. App., 107 S.W. 2d 746, error refused; Cox v. Miller, Texas Civ. App., 184 S.W. 2d 323, error refused; (2) the word "production" as used in the habendum clause of this lease is equivalent to the phrase "production in paying quantities." The

1.—"2. Subject to the other provisions herein contained, this lease shall be for a term of Five (5) years from this date (called primary term) and as long thereafter as oil, gas or other mineral is produced from said land hereunder, or as long as drilling or reworking operations are being conducted on said land as is hereinafter provided.

"3. * * * * where gas from a well producing gas only is not sold or used, Lessee may pay as royalty Fifty Dollars ($50.00) per well per year, and upon such payment it will be considered that gas is being produced within the meaning of Paragraph 2 hereof; * * *.

"5. If, during the primary term and prior to the discovery of any mineral on said land, Lessee should drill a dry hole thereon, this lease shall not terminate if Lessee either commences additional operations for drilling on or before the rental date next ensuing after the expiration of sixty (60) days after the abandonment of said dry hole,/ or commences or resumes the payment or tender of rentals, as hereinabove provided, on or before the rental date next ensuing after the expiration of sixty (60) days after the abandonment of said dry hole. If a dry hole is completed and abandoned during the last period of the primary term, Lessee's rights shall remain in full force and effect without further operations until the expiration of said period. After the discovery of any mineral in paying quantities on the land, all of Lessee's rights shall remain in effect as long as any mineral is produced therefrom; and if, during the primary term, the production of all minerals therefrom should cease from any cause, this lease shall not terminate if Lessee either commences or resumes the payment or tender of rentals, as hereinabove provided, on or before the rental date next ensuing after the exiration of sixty (60) days after the cessation of production, or commences additional drilling or reworking operations on or before said next ensuing rental date. If cessation of production occurs at any time after the expiration of the primary term, then this lease shall not terminate if Lessee, until production is again procured, does not allow more than sixty (60) days to elapse between the cessation of production and the commencement of additional drilling or reworking operations in a bona fide effort to again obtain production, and successive attempt may be made so long as not more than sixty (60) days are allowed to elapse between the completion or abandonment of one well and the commencement of operations on another until production is again obtained. If, at the expiration of the primary term, oil, gas or other mineral is not being produced from the land then covered hereby, but Lessee is then engaged in operations for drilling or reworking operations on some part of the land hereunder, this lease shall not terminate if Lessee does not allow more than sixty (60) days to elapse between the abandonment of one well and the commencement of drilling or reworking operations on another until production is obtained."

term "paying quantities" embraces not only the amount of production, but also the ability to market the product at a profit. Garcia et al v. King et al, 139 Texas 578, 164 S.W. 2d 509, 512. As said in that case, "the object of the contract was to secure the development of the property for the mutual benefit of the parties. It was contemplated that this would be done during the primary term of the contract." To this sentence we might add the phrase, "or during the extension of the lease term." Thus, no matter how great the potential production may be or how many million cubic feet of gas may have been flared, there would be no production or production in paying quantities unless there was an available market; (3) the fact that there is no available market is not an excuse for failure to produce, and the lease terminates unless some other provision will keep it in force. Rogers v. Osborn, 152 Texas 540, 261 S.W. 2d 311; Stanolind Oil & Gas Co. v. Barnhill, supra; Watson v. Rochmill, 137 Texas 565, 155 S.W. 2d 783; Freeman v. Magnolia Petroleum Co., 141 Texas 274, 171 S.W. 2d 339; W. T. Waggoner Estate v. Sigler Oil Co., supra; Cox v. Miller, supra; Holchak v. Clark, Texas Civ. App. 284 S.W. 2d 339, err. ref.; Sellers v. Breidenbach, Texas Civ. App., 300 S.W. 2d 178, err. ref.

The recital of these principles without further elaboration might well be sufficient to demonstrate the fallacy of Gulf's contention in this case.

The trial court, inter alia, made the following findings of fact: (1) No gas was sold from the well until November 22, 1949, when actual deliveries were made to the pipe line company; (2) Gulf was at all times diligent in attempting to secure a purchaser for the gas from this well and in expediting the completion of the pipe line company's facilities and connections; (3) that the marketing of the production from the lease was accomplished within a reasonable time after the completion of the well; (4) that the "shut-in" royalty payment was made within a reasonable time; (5) that the plaintiff had not ratified the lease after the completion of the well and is not estopped from urging that the lease has terminated.

In support of its contention that the lease is kept alive for a reasonable length of time to permit lessee to find a market, Gulf relies on Union Oil Company of California v. Ogden, Texas Civ. App., 278 S.W. 2d 246, wr. ref., n.r.e. The Court does say in that case that the lessee should have a reasonable time to market the gas even though that time would extend beyond the primary term. It defines, however, "a reasonable time" as that

time necessary for the lessee to lay gathering lines to the available market, saying that it was necessary for the lessee "to forthwith begin operations for laying the line and continue such operations with reasonable diligence and dispatch until the gas reached the market." In the absence of those operations the lease was held to be terminated. That decision only supports the holding of the Court of Civil Appeals in our case to the effect that laying extensions and connections from the well to the pipe line by the lessee are to be classified as drilling operations. That question we do not reach. The efforts of Gulf consisted solely of negotiations with the pipe line company and no manual operations were conducted by either Gulf or the pipe line company until some time after the June 7th contract.

The authorities hold to the contrary of Gulf's position here. In Holchak v. Clark, supra, the trial court thought as a matter of law that the discovery of oil kept the term "royalty deed" alive for a reasonable time after its termination date for the purpose of determining whether or not the well would produce in paying quantities. In reversing, the Court of Civil Appeals held that as there was no paying production from the premises at the end of the term, the mineral estate reverted to the grantors. To the same effect is the decision in Sellers v. Breidenbach, supra.

Just as the provisions in this lease have been held to deny a reasonable time to find a market after discovery of oil, so they have been construed to deny a reasonable time wthin which to pay "shut-in" royalty after the "shut-in" has taken place. This was explicitly held in Freeman v. Magnolia, supra, under similar facts, practically the only distinction being that in Freeman the discovery well had been brought in a few months prior to the end of the primary term. Gas was discovered in large quantities but none was used or sold off the premises. The "shut-in" royalty was not tendered for more than four months after the end of the primary term. The lease lapsed as a matter of law, there being no gas produced from the premises on the last day of the primary term, and the royalty not having been paid on or before that date. The lease could not be revived by an attempt to pay the royalty four months thereafter.

The provision in the lease for the payment of "shut-in" royalty is to provide for just that eventuality, namely, where gas has been discovered in paying quantities, but a market is lacking. This rule applies with equal force to the claim that the royalty payment could be tendered at any time within the

period of one year after the well had been capped or "shut-in." Courts will not rewrite an oil and gas lease to provide that production, actual or contractual, will operate to extend its life when it has terminated by its provisions.

■ Gulf seeks to invoke the application for the "60-day-cease-to-produce clause" and says that, since the well did *in fact* produce gas in substantial quantities and was subsequently "shut-in," it therefore *ceased* to produce. Although this well was capable of producing in paying quantities, considerable gas having been flared and an undisclosed number of barrels of condensate obtained, none was ever sold or used on or off the premises. Therefore, under the authorities cited above there was no production from the well within the meaning of the lease provisions. It follows, that since there had been no production, there could not be a cessation of production, and thus the 60-day clause is not available to the petitioner to extend the term of the lease or to delay the tender of the royalty payment. While petitioner discusses a number of cases under this point, and urges the matter with considerable force and logic, we are of the opinion that the question is foreclosed to the contrary. Actually the only case Gulf relies on as supporting its position is that of Shell Oil Co. v. Goodroe, Texas Civ. App., 197 S.W. 2d 395 (wr. ref., n.r.e.). There the tender of "shut-in" royalty was not made before Shell had capped and shut in the gas well. The case is distinguished, however, on several grounds. In the first place gas and condensate had been marketed from the well and the "shut-in" royalty payment was tendered within the 90-day period after production had ceased in compliance with the terms of the lease. In the second place, the royaly payment was not only tendered, but was accepted by the lessors and therefore the decision, we think, has little bearing on the problem presented here.

The last provision in Section 5 of the lease will not support petitioner's theory that it permitted payment of "shut-in" royalty at any time within a period of 60 days after the well was capped. Petitioner argues that the meaning of this provision was to allow a period of 60 days after the completion date of the well either to bring in actual production or pay royalty in lieu thereof or to abandon further operations on that well and commence additional operations on another. What we think petitioner is actually saying is, that after the completion of the well, the provision grants additional time within which to determine whether the well is to be abandoned or not. Here there was no question at any time as to abandonment. It was capped only because of the lack of market facilities. In the usual course

of development, operations normally would continue to make the well productive until the decision to abandon is made. The lease provision means what it says, namely, that in the event of abandonment the lessee has 60 days within which to decide on his further course. To adopt the meaning ascribed to it by Gulf would be to compel a strained and unnatural construction. To sum up, there was no production from the well during the term of the lease as extended by drilling operations; the "shut-in" royalty was not paid so as to bring about constructive or contractual production, and no provisions of the lease can be construed to furnish a further extension of the primary term or to make the tender of royalty in this case timely.

■ We now pass to the points raised by the lessor, Reid, in his application. He contends that the Court of Civil Appeals erred in remanding the case for another trial. To arrive at that result the Court of Civil Appeals reasons that when paragraph 2 and the last provision of paragraph 5, are considered together the latter provision should be construed to read: "If, at the expiration of the primary term, oil, gas or other mineral is not being produced from the land then covered hereby, but lessee is then engaged in operations for drilling or reworking operations on some part of the land hereunder, this lease shall not terminate so long as said operations shall continue." So the Court apparently thought that a fact question, not passed upon by the trial court, was raised as to whether or not the lessee, after capping the well, prosecuted "drilling operations" with due diligence measured by common-law standards and further that as to that fact the case had not been fully developed. The trial court had held that the lessee had at all times exercised due diligence in its efforts to provide a market and that these efforts culminated successfully in obtaining the pipe line company to lay and connect its gathering lines to the well. But these efforts, however, merely consisted of negotiations and not in any manual operations on the part of the lessee. In the light of settled rules we think the term "operations" cannot be extended to include a search on the part of lessee for a market or to secure a purchaser. If we accept, as we must, the conclusion that there was no production, therefore, no cessation of production and no abandonment, then in this case it necessarily follows that there was a gap between the completion of the well and production, and the lease terminated. We think, therefore, that the Court of Civil Appeals was in error in remanding the case for the determination of the fact question of diligence.

■ The last point raised by the lessor, Reid, is to the effect that

the Court of Civil Appeals failed to render judgment in his favor as to 1/8th of the net value of the gas and condensate produced by the lessee. This concerns the question as to what credits, if any, are to be allowed to the lessee in equity for the lessor's proportionate part of the expenses incurred by lessee in obtaining production. Lessor's contention is that he became a tenant in common with Gulf when his lease expired and therefore he is proportionately liable for maintenance and marketing expenses from the time that relationship began, but that he is not to be held for any part of the costs of drilling operations and the completion of the well in the first place. This point has not been passed upon by either the trial court or the Court of Civil Appeals, nor is the point briefed here. We therefore concur in the remand to the trial court, but only for the purposes of determining this question.

The judgment of the Court of Civil Appeals is modified and as so modified is affirmed.

Opinion delivered March 23, 1960.

Rehearing overruled July 20, 1960.

ON REHEARING

MR. JUSTICE SMITH, joined by JUSTICE HAMILTON, dissenting on motion for rehearing.

Upon further consideration of the record in this case, I respectfully dissent. This court's opinion should be revised so as to clearly recognize that a provision in an oil, gas, and mineral lease is necessarily implied for the purpose of continuing the term of a determinable fee in force during a temporary delay for a reasonable time between completion of a gas well and commencement of production by getting the gas "on stream" and to allow a reasonable time within which to pay shut-in royalty.

My research fails to reveal any case involving comparable factual situations and legal questions which support the holding of the court as reflected in our original opinion. A study of the briefs, transcript, and statement of facts in the case of Freeman v. Magnolia Petroleum Co., 141 Texas 274, 171 S.W. 2d 339, has convinced me that neither the legal question nor similar facts were in the Freeman case. The failure to recognize the distinction between the Freeman case and the present case has led to the following erroneous and controlling holding by this court in the present case. In our original opinion, we said:

"Just as the provisions in this lease have been held to deny a reasonable time to find a market after *discovery of oil,* so they have been construed to deny a reasonable time within which to pay 'shut-in' royalty after the 'shut-in' has taken place. This was explicitly held in Freeman v. Magnolia, supra, under similar facts, practically the only distinction being that in Freeman the discovery well had been brought in a few months prior to the end of the primary term. * * * "The lease lapsed as a matter of law, there being no gas produced from the premises on the last day of the primary term, and the royalty not having been paid on or before that date." (Emphasis added.)

The Freeman case was a suit primarily against D. D. Harrington who owned only an interest in gas and no interest in oil. Prior to the drilling of the well, Magnolia conveyed to Harrington the dry gas and dry gas rights only, in and under 10,578 acres, including the land involved in the Freeman suit. At the same time Harrington conveyed to Magnolia all his interest in the oil rights and casinghead gas and casinghead gas rights in and under the same oil and gas leases. All rights of Magnolia and Harrington stemmed from the original oil and gas lease executed by the Freemans to George Mager, Magnolia's assignor. Thereafter, on August 19, 1939, Magnolia and Harrington entered into a drilling agreement. It was agreed that Harrington was to drill a test well on the Freeman land. Harrington was primarily interested in the discovery and production of gas and Magnolia was interested in the discovery and production of oil. Magnolia reserved the right to inspect the well and to supervise at any time the drilling of the well, or any portion of same, from the bottom of the gas strata to its completion. The drilling agreement further provided: "If and when an *oil show or strata* is encountered Magnolia shall immediately be notified and at its election shall have the right of testing *said oil show.*" (Emphasis added). This agreement points up that Magnolia was exercising reasonable diligence to bring both oil and gas into production for the benefit of the original lessors as well as the lessees. In the event Magnolia had exercise its right to take over the well and further drill for oil after Harrington had discovered gas in paying quantities, what would have happened to Harrington? Under our theory, as advanced in the original opinion, Harrington's gas rights would have been unreasonably appropriated by the lessors under judicial fiat and without giving Harrington a reasonable time to pay shut-in royalty. Our holding here would have also denied Magnolia any rights which were specifically granted under the 60-day-clause in the oil and gas lease. This question was not before the court in the Freeman

case for the simple reason that Magnolia and Harrington failed to do anything after December 22, 1939, the date of gas discovery, to give rise to such a question. They made no contention that they had the right to pay shut-in royalty within a reasonable time after the gas well was completed. The "reasonable time question," therefore, had nothing to do with the decision in the Freeman case. The opinion in the Freeman case clearly shows that the decision turned on Magnolia's contention "that the provision for the payment of the $50 to declare a potential well a 'producing well' was an absolute and unconditional agreement on the part of the lessee, rather than an option." See briefs in Court of Civil Appeals — Freeman case. Mr. Justice Brewster, speaking for the court in the Freeman case, pointed out that paragraph 2 of the lease in question, the habendum clause, provided that the lease should remain in force for ten years from April 7, 1930, and so long thereafter as oil, gas or other mineral is produced from the leased land; that the gas well in question was completed on December 22, 1939; that it was not claimed that any oil or other mineral was being produced therefrom on April 7, 1940, when the *primary* term ended; that Magnolia Petroleum Company did not pay the $50 on or before April 7, 1940; that Magnolia *was contending that it could make the payment any time within* a year from December 22, 1939, and for that reason it was within its rights in not tendering the shut-in royalty until more than four months after April 7, 1940, the expiration date of the primary term. Thus, it is seen that Magnolia did nothing to keep the lease alive. The lease was, in fact, dead when the shut-in royalty was paid. Since there was no production and the shut-in royalty was not paid before the expiration of the primary term, the court held that Magnolia's rights under the lease had been forfeited, and that the lease had terminated for nonproduction.

The opinion in the Freeman case contains this significant statement: "If respondents [Magnolia] had wanted to prevent lapsation of the lease for non-production, they could easily have done so by paying the fifty dollars on or before the last day of the primary term." Even though the reasonable time principle was never mentioned or discussed in Freeman, supra, the language above quoted, although dicta, indicates that the court was of the opinion that the period of approximately three and one-half months between December 22, 1939 and April 7, 1940, was not an unreasonable time within which to pay the shut-in royalty. In our case, where the lessee in the exercise of its rights under the lease obtained production on January 18, 1949, after the expiration of the primary term and paid the shut-in royalty

within 30 days thereafter, could it not reasonably be held that such payment was made within the extension period (60 days), and therefore within the secondary primary term as fixed by the terms of the original oil and gas lease? Certainly, under the facts in the present case, Gulf tendered the shut-in royalty long before the occurrence of a limitational event. In other words, the tender was made while the lease was still in force. Freeman, in his brief in the Court of Civil Appeals, practically admits that if Magnolia had been engaged in operations for drilling, mining, or reworking of a well on April 7, 1940, the date of the expiration of the primary term, or had commenced additional drilling or reworking operations within 60 days thereafter, the lease would have been kept alive. This can only mean that the tender of shut-in royalty in the present case, before the rights under the lease terminated or before the limitational event occurred, kept the lease alive.

I respectfully decline to agree that the Freeman, Holchak, and Breidenbach cases are absolute authority for the holding that Gulf's lease has terminated. Such cases cannot be authority for such holding where the questions presented here were never befor the court in the Freeman et al. cases, and especially where the facts were foreign to the facts in the present case. The facts and principals of law controlling here will now be discussed. The rule I propose to have adopted is not a so-called liberal Oklahoma or West Virginia rule, but is a rule entirely in keeping with the facts and the terms of the lease contract involved in this case.

I cannot agree that the mere capping of a gas well capable of producing (88,000,000 cubic feet) in paying quantities is a limitational event which will automatically terminate the determinable fee acquired under the lease. Admittedly, there is no lease provision expressly written in the Reid lease which provided that a temporary cessation of drilling operations would not terminate the lease. If this court is to be consistent with the law as announced in the case of Midwest Oil Corporation v. Winsauer, 159 Texas 560, 323 S.W. 2d 944 (1959), it should now say in the present case that such a provision is necessarily implied. It is not a matter of equity in the strictest sense, but equity dictates a recognition of this implied covenant. It is common knowledge that a market for the product (gas in this instance) can only be obtained after production has been discovered and the amount or volume of gas is determined. Where no time is fixed for performance of any phase of a contract, the law necessarily will imply that it is to be performed within a

reasonable time. That which is implied in a written contract is as much a part of it as though it were expressed therein.

In the interpretation and construction of oil, gas, and mineral leases this court should seek to give effect to the true intention of the parties. In this effort, we should follow established rules used to interpret contracts and other bilateral instruments. See McMahon v. Christman, 157 Texas 403, 303 S.W. 2d 341, 346; Id. [dissenting opinion], 304 S.W. 2d 267. Adoption of a reasonable construction which avoids forfeiture is one of the well recognized rules.

The lease necessarily must be construed not solely by looking to the habendum clause in the lease, but in the light of all the express covenants as well as the implied covenants to be read into the lease.

The court's statement of the nature of Reid's cause of action that it is one "to have the court decree that the lease terminated under its own provisions * * *" and the holding of the court clearly demonstrate that the decision rendered was without regard to the all important implied covenant that the lessee shall have a reasonable time within which to commence the actual marketing of the gas, or, in lieu thereof, to pay "shut-in" royalty and thereby commence constructive production within a reasonable time. There are no facts showing that Gulf failed in the prosecution of operations as contemplated by the parties. But, assuming that temporary cessation of drilling operations constituted a cessation of operations, and nothing was done for 28 days, except to design, prepare, and install equipment and negotiate for a market, it is respectfully submitted that the rights, privileges, and opportunities afforded a good faith lessee (Winsauer case) who has temporarily ceased to produce should also be extended to the good faith lessee who has temporarily ceased drilling operations. Since Gulf was found to be in good faith and using diligence toward the end of placing the gas well "on stream," its lease should not be cancelled merely because the actual drilling operations had ceased and the shut-in royalty was not paid until 28 days after such cessation. This is especially true upon taking into consideration the 60-day clause contained in the lease. The record shows that the shut-in royalty payment was tendered before it was humanly possible to have put the well on stream if United's pipe line had been right at the line, and well within the 60-day period. Since the tender of shut-in royalty is tantamount to production, Gulf was for all intents and purposes "on stream" within three weeks of the

temporary cessation of drilling operations. In the case of Midwest v. Winsauer, supra, the production was not resumed until 174 days had expired from the temporary cessation of production.

It is impossible to lay down an accurate general rule with respect to what constitutes production or marketing within a reasonable time in every case. Whether either has been so obtained must be left to the particular facts of cases as they arise. See Tate v. Stanolind Oil and Gas Co., 172 Kan. 351, 240 P. 2d 465, 469 (1952). In that case the primary term expired October 24, 1947. The first and only well, a gas well, was completed on September 15, 1947, before the expiration of the primary term. Although it was admitted that the well would produce in paying quantities, no production was actually had from the well during the primary term. On September 24, 1947, Stanolind made application to the Commission for a well allowable. Stanolind exercised diligence in an effort to negotiate a contract with a pipe line company. The contract, however, was not executed until January 26, 1948. On February 25, 1948, the Commission fixed an allowable and Stanolind connected the well to its pipe line. Tate took the position that since no production was had prior to the expiration of the primary term, the lease had expired and he was entitled to a release. Stanolind declined to execute the release on the ground that it was the holder of a valid oil and gas lease. On December 12, 1947, Tate filed suit to quiet title. A judgment in favor of Stanolind was affirmed by the Supreme Court of Kansas. The court held that the agreement of the parties, as embodied in the lease contract, disclosed their intent to allow a reasonable time in which to obtain production. The habendum clause was similar to the one contained in our lease. It specified a primary term of 10 years. However, the same clause provided that the lease shall remain in force as long thereafter as oil or gas, or either of them, is produced from said land. The court recognized that the great weight of authority was in harmony with the view that actual production during the primary term was essential to the extension of the lease beyond that fixed term. But the court went on to say that such a result would obtain, unless the lease contained some additional provision indicating an intent to extend the *right to produce beyond the primary term*. In the Kansas case, supra, the court found a clause in the lease, commonly known as the "drilling clause," which read:

"If the lessee shall have the right to drill such well to completion with reasonable diligence and dispatch, and if oil or

gas, or either of them, be found in paying quantities, this lease shall continue and be in force with the like effect as if well had been completed within the term of years herein first mentioned."

The court considered the habendum and drilling clauses together and upon applying a reasonable interpretation of all pertinent provisions of the contract instead of determining the question by a critical analysis of the habendum clause alone, held:

"Applying the foregoing principles we think both the habendum and the drilling clause reasonably may be made operative. The first clause fixes the term of the lease as ten years from its date. Under it the lessee may hold the lease for that period by merely paying the prescribed annual rentals. If, however, that is all he does the lease expires by its own terms at the end of its fixed primary term. On the other hand, if drilling operations on a well are completed during the primary term and oil or gas is discovered in paying quantities, or if a well as commenced during such term and completed thereafter with diligence and dispatch the lessee, in either event, must produce oil or gas within a reasonable time or the lease will expire and be subject to cancellation. This we think is a fair, a reasonable, construction of the two clauses involved."

The court stated that it was not unmindful of the place and purpose of the habendum, the term clause, and the drilling clause in oil and gas leases. It was recognized that in a case of irreconcilable conflict between such clauses, the habendum clause would ordinarily control. Where, however, the clauses can be harmonized so as to give effect to each of them that should be done.

The question: Was production obtained within a reasonable time after completion of the well? The court answered the question by first tersely stating the facts:

"* * * The primary term ended October 24, 1947. The well was completed at a substantial cost about five weeks before the primary term ended. Also, a month prior thereto appellee made application to the Commission for a well allowable. Eleven days before the expiration of the primary term a hearing was had on such application before the Commission. At that time appellee advised the Commission of its arrangements with Interstate to take the gas. The Commission took the application under

advisement. It did not announce a decision before the primary term ended. Interstate refused to take the gas. Appellee promptly proceeded before the Commission to compel Interstate to take it. Interstate then agreed to do so. On February 25, 1948, the Commission fixed the well allowable and Interstate connected its pipe line. * * * ."

Then held:

"* * * Under these circumstances we shall not say the district court erred in resolving the question of producing or marketing within reasonable time in appellee's favor."

The Tate case, it seems to me, supports the proposition that the determinable fee does not terminate automatically and arbitrarily when the well is completed in the absence of production. The Winsauer case is also illustrative of the point that the parties to the present oil and gas lease did not intend and the law does not require an arbitrary application of the habendum clause. In the Winsauer case we held that cessation of production was temporary and within the contemplation of the parties. It is not unreasonable to hold in the present case that *withholding of production was temporary* and within the contemplation of the parties. In Winsauer, supra, the court stated: "Although the royalty deed under consideration does not expressly provide that the term royalty will not terminate because of temporary interruption, we hold that such a provision is necessarily implied." It seems that Gulf presents a very logical argument when it says that a similar provision is implied in the present case. In applying the habendum clause, "production" is the requirement. If temporary cessation of production does not destroy the determinable fee under the habendum clause, why should temporary withholding of the same production under the record in this case destroy the same determinable fee under the same habendum clause? The court in the present case has rejected the temporary cessation principle largely on the belief that since there was no production and no actual drilling or reworking operations going on after January 18, 1949, the lease automatically terminated as of that date, citing such cases as Freeman v. Magnolia Co., 141 Texas 274, 171 S.W. 2d 339; Holchak v. Clark, Texas Civ. App., 284 S.W. 2d 399, er. ref., and Sellers v. Breidenbach, Texas Civ. App., 300 S.W. 2d 178, er. ref. The Freeman case has heretofore been analyzed in an effort to demonstrate its inapplicability to the facts in the present case. There has been no permanent cessation of operations in the present case. Whereas in that case, there was no actual production after discovery and shut-in royalty was not paid until nearly four months after the end of the primary term.

The rights of the parties are to be determined by taking into consideration all of the clauses in the oil, gas, and mineral lease to ascertain the intention of the parties. The lease contains clauses which clearly indicate that it was the intention of the parties to allow a reasonable time within which to market the gas. It is not to be presumed that the parties intended that an impossible thing should be done or that the parties deliberately entered into an agreement calling for an *impossible condition or event as a test of performance*.

"A construction which renders performance of the contract possible will be adopted, rather than one which renders its performance impossible or meaningless, unless the latter construction is absolutely necessary; and it has been held that no matter how clear the ordinary significance of the words, they must not be given a meaning which, when applied to the subject matter of the contract, will render performance impossible." 17 C.J.S., Contracts, section 318, p. 738.

This court, in the case of Portland Gasoline Co. v. Superior Marketing Co., 150 Texas 533, 243 S.W. 2d 823, 824, quoted with approval from 12 Am. Jur. 791, Contracts, section 250, the following:

"Agreements must receive a reasonable interpretation, according to the intention of the parties at the time of executing them, if that intention can be ascertained from their language. In the transactions of business life, sanity of end and aim is at least a presumption, though a rebuttable one. A reasonable interpretation will be preferred to one which is unreasonable. * * * ."

This court in the same opinion quoted from 12 Am. Jur. 794-795, Contracts, section 251, the following:

"An agreement should, moreover, be construed in such a way as to make the obligations imposed by its terms mutually binding upon the parties, unless such interpretation is wholly negatived by the language used. This rule is based on the presumption that when parties make an instrument, the intention is that it shall be effectual, and not nugatory. A meaning which is sufficiently definite will be favored. The terms of a contract must, if possible, be construed to mean something rather than nothing at all."

Another rule which has application here is found in 2 Summers Oil and Gas 596-7, and reads as follows:

"Whenever a duty to perform an act or series of acts is fixed by contract or implication of law, and the time, manner, and extent of performance is not fixed, the law implies that such act or acts shall be performed within a reasonable time and with reasonable diligence. Where, therefore, oil and gas leases do not state the time, manner, and extent of performance of express and implied duties to test, develop and protect the land and *market* the product, the courts have of necessity tested the lessee's performance by the standards of reasonable time and reasonable diligence." (Emphasis added).

The tremendous problems and responsibilities confronting a lessee from the beginning do not end with the discovery of gas in paying quantities. Necessarily, the lessee in this case must be accorded a reasonable time after discovery within which to complete his marketing arrangements, and thus to complete the well to production. The principal object of the contract was to secure the development of the property for the mutual benefit of the parties. This objective cannot be attained under the strict construction given the lease by the court. The construction given wholly disregards the rule that the express obligations of the lessee cannot be carried out for the mutual benefit of both parties unless a corresponding obligation is implied that the lessor is to allow a reasonable time to actually market the gas or obtain constructive producting by paying the shut-in royalty.

"Mutuality may result from an implied obligation on the part of one of the parties. Though a contract on its face and by its express terms may appear to be obligatory on one party only, if it is manifest that it was the intention of the parties, and the consideration upon which one party assumed an express obligation, that there should be a corresponding and correlative obligation on the other party, such a corresponding and correlative obligation will be implied, and the contract held to be mutual,—as where the act to be done by the party expressly binding himself can only be done upon a corresponding act being done or allowed by the other party." 10 Texas Jur. 161, Contracts, Sec. 95, also quoted with approval in the case of Portland Gasoline Co. v. Superior Marketing Co., supra.

The commencement of the well does not mean actual drilling. It is sufficient if preparations to drill are being made, such as making and clearing a location and delivering equipment to the well site. This being true, it is not unreasonable to say that such operations which were begun in good faith and prosecuted with diligence should not be held to have ended with cessation of

actual drilling, but should be held to have terminated only in the event the lessee fails after discovery to prosecute with diligence a continuation of his operations by negotiating and securing a profitable marketing contract for both parties by placing the gas "on stream" within a reasonable time. There is nothing in the lease to indicate that the parties intended to define any time element within which gas might be marketed, especially when production resulted from drilling operations which were diligently carried out under the 60-day extension clause of the lease. Likewise, the lease does not manifest any intention that the shut-in royalty must be tendered contemporaneously with the capping of the gas well. On the other hand, the liberal terms of the lease including the 60-day clause and the shut-in royalty clause were apparently inserted in the lease contract in recognition of the fact that after the discovery of gas there would be delays in marketing such product. The provision for shut-in royalty within itself implies a recognition by the parties mutually at interest, Gulf and Reid, that a reasonable time would be necessary in the event of the discovery of gas to obtain the operational facilities essential to market the gas in the stream of commerce. However, if the principles of the holding with reference to the 60-day clause announced in the case of Stanolind v. Newman Bros., 157 Texas 489, 305 S.W. 2d 169, are to be followed, and I think they should, we never reach the question of whether the shut-in royalty clause alone, by necessary implication, afforded Gulf a reasonable time within which to tender the specified royalty payment. A fair and reasonable construction of the 60-day commence drilling clause requires a holding that it operated to extend the lease for a period of 60 days from and after the cessation of drilling operations. The lease, therefore, was alive when the shut-in royalty was paid. The payment was made well within the 60-day period. Where the parties have, as here, provided in the lease for constructive production in lieu of actual production, the ultimate purpose of the lease is served and the mutual interests of both parties are protected by affording a reasonable time after completion of a gas well within which to commence the constructive production. By giving effect to the 60-day "commence" drilling clause, the period between January 18, 1949 and the date of tender of the shut-in royalty was not as a matter of law an unreasonable time within which to commence constructive production. The trial court was correct in so holding. The express provision authorizing an extension of the primary term by drilling or reworking operations, shows that the parties did not intend that the habendum clause was to be literally the final word. As was said in the case of Stanolind v. Newman Brothers, supra:

"It will be noted that the habendum clause does not merely provide for a term of five years and as long thereafter as production continues. Nor does it purport to make only the primary terms subject to the other provisions of the lease. Instead it provides that 'subject to the other provisions herein contained, this lease shall be for a term of five (5) * * * and as long thereafter as oil, gas or other mineral is produced * * *.' The stipulation for a term of five years and as long thereafter as production continues is thus both modified and enlarged by the recital that it is subject to the other lease provisions, and is required to yield to any and all other provisions which affect the duration of the lease. It is clear then that the lease may be kept in force after the end of the primary term either by production or by the operation of its other provisions."

In the present case the standard of diligence has been fixed as being 60 days. The "commence drilling" clause, in its entirety, reads:

"If, at the expiration of the primary term, oil gas or other mineral is not being produced from the land then covered hereby, but lessee is then engaged in operations for drilling or reworking operations on some part of the land hereunder, this lease shall not terminate if lessee does not allow more than 60 days to elapse between the abandonment of one well and the commencement of drilling or reworking operations on another until production is obtained."

The court here has failed to recognize that whether a well is to be an oil well or a gas well is often not known until the well is in fact completed. No consideration has been given to the fact that the area in which this gas well is located is an associated gas reservoir. The well was bottomed in a sand which in its entirety included gas and oil. It developed, however, that this particular well was so located structurally that none of the oil section of that sand was penetrated. The well was completed and "perforated" in the gas section of the reservoir. There was no abandonment. Had there been an amandonment, Gulf could have, within 60 days from the date of such abandonment, gone back into the well and attempted by reworking operations to complete it as an *oil* producer in a lower zone of the "associated reservoir" (one having a free gas column above and in contact with a lower oil column). Gulf, under the terms of the lease, could have elected to abandon the gas well, but it did not so elect. Since there was no such abandonment as to give to Gulf the right to recommence drilling or reworking operations, it can

only be said that those operations had never ceased, and, therefore, the tender of the shut-in royalty was made even before operations had ceased. Since the lease expressly states that the primary term is extended by drilling operations, and, further, since the shut-in clause does not come into play until the lessee establishes that there is a well capable of producing in paying quantities, and, further, since the lessor, as well as the lessee, is looking toward not only the discovery but the marketing of the minerals discovered, and since it is rarely true that the drilling operations result in immediate production, and because the shut-in royalty clause is to provide for the hiatus between production and marketing, it is reasonable and logical to hold that the Reid lease was still in full force and effect at the time the shut-in royalty payment was made. It necessarily must be implied that the lessee had a reasonable time in which to tender the shut-in royalty after gas was discovered in paying quantities subsequent to the end of the primary term. Furthermore, since a well capable of producing gas in paying quantities was completed on January 18, 1949, well within the extended term, and since gas was brought forth and reduced to sufficient control for the purpose of running from the lease or putting the gas "on stream" from the lease though not marketed prior to the expiration of the extended term, Gulf was equitably entitled to a reasonable time within which to market the gas. See State of Oklahoma ex rel. Commissioners of the Land Office v. Carter Oil Company, Sup. Ct. of Okla., 336 P. 2d 1086; McVicker et al. v. Horn, Robinson and Nathan et al., Sup. Ct., Okla., 322 P. 2d 410; Panhandle Eastern Pipe Line Company v. Isaacson, 10 Cir. 255 F. 2d 669. Bear in mind that these particular activities are affected by the orders and rules of the Railroad Commission.

In the case of State v. Carter, supra, the court, in holding that in every grant there passes by implication that which is reasonably necessary to the enjoyment of the thing granted, held that in the absence of a special clause requiring marketing within the primary term fixed in the lease, the completion of a well, as provided therein, capable of producing oil or gas in paying quantities will extend such term, provided that within a reasonable time the actual length of which must of necessity depend upon the facts and circumstances of each case, a market is obtained and oil and gas is produced and sold from such well. This holding can well be applied to the facts in our case. The facts show not only discovery of gas, but the constructive taking of gas in pursuance of the express and implied covenants of the lease. The lease recites as a part of the consideration that the grant to lessee was for the purpose of "investigating, exploring,

prospecting, drilling and mining for and producing oil, gas and all other minerals, *laying pipe lines, building tanks, power stations,* telephone lines, *and other structures* thereon to produce, save, take care of, treat, transport, store and own said products * * * ." It is respectfully submitted that Gulf has neither performed or failed to perform any act which would defeat the ultimate aim of all parties which was to discover in the first place, and then act with diligence pursuant to the covenants in the lease to place the gas "on stream." It is undisputed that Gulf had control of the gas on January 18, 1949, it having been definitely located in the earth, the best reservoir known to the industry for holding gas pending getting it into the pipe lines. Gas is marketed by the field and not by the well. This was the sixth well in the field which had been successfully drilled and capped. The building of a large reserve in this manner means more profits to both the lessor and lessee. The large reserves afford a better opportunity to enter into more favorable marketing contracts. These contracts are usually made for a period of twenty years. Necessarily, in order to obtain the best results financially, the lessee, who is also the agent for the lessor in marketing the gas, must have something to sell. Favorable contracts cannot be made without an adequate reserve. Negotiations with the United Pipe Line Company were begun long before the discovery of gas in the particular well. These negotiations were continuously in progress from and after January 18, 1949. Gulf began immediately after the discovery of gas to design and plan the type of equipment to go on the well. As soon as the equipment was ready it was installed. A Gulf witness testified that on August 3rd in 1949, Gulf "commenced work of installing the separating, heating, and regulating equipment and commenced work on the storage facilities. The tank battery on October 11, 1949, and our first delivery of gas to the pipe line was on November 22, 1949." When asked why the machinery was not installed around the well sooner than August, the witness replied: "For one reason we had to plan a type of equipment to go on the well; — we had to have a sale for the gas; and we had to order and have delivered, the materials to put on the well." The evidence shows that it was necessary for Gulf to determine the bottomhole pressure in order to determine the open flow capacity of the well, and to design the equipment. I construe this to mean that it would have been impracticable to have begun the planning and designing of this equipment before January 18, 1949, the date it was found that the well was a gas well and not an oil well. While all this was transpiring, Gulf, on February 19, 1949, exercised its right to pay the shut-in royalty. Reid had expressly granted this right in the lease

agreement. In granting this right, Reid's letters to Gulf show that he recognized that if the drilling operations resulted in gas discovery, there would be a time gap between discovery and actual production. Reid also knew or was charged with knowledge that all operations, including tests, allowables, etc., were to be under the supervision of the Railroad Commission. The evidence shows that Gulf did not have a gas purchaser there on the ground with a pipe line immediately upon discovery for the reason "you don't sell gas by the well. You sell, the common industry practice, on both the part of the purchaser and the seller, is that you sell them the entire field and all of the gas that you have underlying the field." Although the pipe line was not physically present, Gulf was in a position to bring about the availability of a pipe line and exercised due diligence in doing so. On June 10, 1949 the contract with the pipe line company was actually signed. The time which elapsed between the beginning of negotiations in 1948 and the signing of the contract in June 1949 was not due to negligence on the part of Gulf, but was the normal result of Gulf's efforts to obtain the best contract for the benefit of Gulf and Reid. Gulf was at all pertinent times endeavoring to make a profitable contract. The witness testified that "I think when we first talked to a pipe line company we only had three gas wells shut in. Of course, this was in the early development stages and we had a drilling rig active in the field and as we drilled each well, of course, we would test it and try to determine something about the size of the reserve and the value of the assets we were endeavoring to sell and the larger the reserve the better price and the better bargain we would get." Reid was advised about the negotiations and signing of the contract. Reid had made some inquiry as to when Gulf was going to "put the well into production." Gulf advised Reid and other lessors of the situation to show that "we were using diligence and doing everything possible to market the gas as well as we could possibly do it." I digress here to say that if Reid had a cause of action at all it was one for damages and not to cancel the lease. However, he did not elect to pursue this course.

The witness testified that "as gas contracts go we handled it pretty rapidly. I have been on some that—right now we are still working on some contracts that we have been working on for a period of four or five years." He further testified that he was an expert in the matter of gas contracts, and that in his opinion the period between June 7, 1949 and November 22, 1949 was a reasonable time within which to begin delivery of the gas. When asked why the delay, he replied: "Well, the * * *

United Gas Pipe Line Company had to install a *field* gathering system which was quite an extensive system into each one of the wells and into each tank battery and of course, in order to do so they had to secure right of way and they had quite a few problems before being able to get the line in and during that time I called them up very frequently and actually, I suppose I made a pest of myself trying to get them to hurry up and get something in and let us start delivering the gas. But, as I said, it took them from June 7th until November 22nd to get the facilities and get them in shape for us to go ahead and start delivering gas." Thus, it is conclusive that Gulf's lease could not have terminated. Gulf has diligently and within a reasonable time complied with its legal obligation to not only prosecute its drilling operations with diligence, but to market the gas as well. The general rule is that where production results from drilling operations and the operator or lessee is unable to market the gas on account of the lack of an available market or of pipe line connections no forfeiture results if, by the exercise of due diligence on the part of the operator, or lessee, the well is equipped and a market is obtained within a reasonable time. The test of performance generally applied is whether or not the lessee has used due care and diligence in an attempt to market the gas. See 2 Summers Oil and Gas, Section 400, pp. 589-590. See also Guleke v. Humble Oil & Refining Co., Texas Civ. App., 126 S.W. 2d 38, no writ history, but cited with approval by this court in Midwest v. Winsauer, supra; Union Oil Company of California v. Ogden, Texas Civ. App., 278 S.W. 2d 246, wr. ref. n.r.e. (This case was cited with approval by this court in Midwest v. Winsauer, supra, but thus far, has been rejected by this court in the present case.) Our approval of these cases, together with our holding in Midwest v. Winsauer, supra, in my opinion committed this court to the proposition that the facts showing temporary cessation of operations and reasonable diligence to get the well "on stream" will prevent the automatic termination of an oil and gas lease. In other words, we have recognized in other cases that there can be a situation where operations may temporarily cease, yet the lease will not automatically cease. Definitely, we have held that temporary cessation of production did not automatically terminate the Midwest v. Winsauer lease. I can see no valid distinction between temporary cessation of production and temporary cessation of drilling operations. The legal principle is the same. Both occurrences should have equal dignity in so far as they can forestall and prevent an automatic forfeiture of valuable rights under an oil and gas lease. Cases like Holchak v. Clark, and Sellers v. Breidenbach cited in support of the opinion of the court do not

militate against the application of the temporary cessation of operation principle advocated here. As heretofore stated, the question of reasonable time was not before this court in the Freeman case.

In the Holchak and Sellers cases, supra, the express provisions in the royalty deeds in each of the cases are controlling and take them out of the category of cases I contend to be authority in support of the views herein expressed. Each deed contained a positive, unequivocal statement that in the absence of production on the critical date *this grant shall become null and void, and the minerals hereby conveyed shall revert to the said grantor*. The term of those deeds was therefore not left to rest upon a reasonable construction of the usual habendum clause. The parties there were satisfied with nothing less than a plain, affirmative nullifying provision. Holchak, supra, was a discovery case. The well was not completed by the critical date. An oil discovery was claimed on the basis of a drill-stem test. Examination of the record discloses that the term royalty deed did not contain the habendum clause usually found in oil and gas leases. Instead, it provides that the grant shall become null and void "* * * in case there is no paying production * * * *" on the critical date. The court stated that "discovery" is not equivalent to "production," and held that discovery followed by continued operations with due diligence did not maintain the term royalty interest in force beyond the date fixed in the royalty deed. It is true that Holchak, supra, also said that the holding in Bain v. Strance, Texas Civ. App., 256 S.W. 2d 208, wr. ref., n.r.e., to the effect that *discovery* followed by diligent operations will maintain the royalty interest, was dicta and was wrong. I cannot see how the holding in the Bain case which was declared dicta in the Holchak case could have any bearing on our holding in this case. The writer in the Bain case undoubtedly was thinking about a factual situation such as we have here in Gulf v. Reid when he said a reasonable time within which to market the product must be allowed. Granting that this was bad dicta in Bain, Supra, I say it is good dicta when considered in the light of the facts in our case. No shut-in gas well clause is mentioned. In the Breidenbach case two gas wells had been completed apparently at an earlier date and the court assumed they were capable of *"Paying production"* but were shut in on the critical date. Perhaps they were shut in much earlier, with the lapse of more than a reasonable time for commencement of actual production. In any event, the express nullifying provision was in the deed, and, as the court points out, the deed contained no shut-in gas well provision. The Holchak and Breidenbach cases.

were distinguished but not expressly approved by this court in Midwest Oil Corp. et al. v. Winsauer et al., 159 Texas 560, 323 S.W. 2d 944. I think they are equally distinguishable from the present case.

## SUMMATION

All that has been said herein can be reduced to the following holdings:

(1) The construction of the "commence drilling" clause hereinabove adopted requires this court to hold as a matter of law that the shut-in royalty payment was tendered well within the secondary primary term and before the limitational event occurred and, of course, at a time when the lease was still alive.

(2) If shut-in royalty was not tendered within the secondary term, as a matter of law, then the lease which includes a shut-in royalty clause is construed to mean that a shut-in royalty may be tendered within a reasonable time after discovery of gas production in paying quantities; that such production having been obtained on Januar 18, 1949, and the shut-in royalty having been tendered (equivalent to payment) within 30 days thereafter, such tender was made within a reasonable time as a matter of law; if not, then the question of whether the shut-in royalty was tendered within a reasonable time is one of fact.

(3) The question of reasonable time within which to pay shut-in royalty or to market the gas was not before the court in the Freeman, Holchak, and Breidenbach cases.

(4) The reasonably prudent operator test as declared in Clifton v. Koontz, 160 Texas 82, 325 S.W. 2d 684, and the reasonable time principle as announced in Winsauer, supra, Tate, supra, and Cox v. Miller, Texas Civ. App., 184 S.W. 2d 323, wr. ref., are to be recognized and in doing so the record shows without dispute that Gulf acted as a reasonably prudent operator in obtaining a contract to market the gas and in putting the gas well "on stream" within a reasonable time. In any event, the evidence present a fact issue on this question. Therefore, the judgment of the trial court should be affirmed. However, if the questions have not been determined as a matter of law, then, in view of the erroneous holding of the Court of Civil Appeals that the question of reasonable time both as to payment of shut-in royalty and marketing the gas, the case

should be returned to the Court of Civil Appeals for further consideration consistent with this opinion.

Opinion delivered July 20, 1960.

Mr. JUSTICE GREENHILL, dissenting.