**CHAMPLIN PETROLEUM COMPANY, a corporation, Plaintiff,**

v.

**MINGO OIL PRODUCERS, a corporation, and Mike Strand, Lois Strand, Eleanor Strand, W. David Hammons, Penelope Hammons, Neuman C. Petty and Wayne Clark, as Officers Directors and Shareholders of Mingo Oil Producers, Defendants.**

No. C84–508–K.

United States District Court,
D. Wyoming.

Jan. 29, 1986.

Alan L. Sullivan, Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah, D. Thomas Kidd, Casper, Wyo., and Molly Sommerville, Champlin Petroleum Co., Englewood, Colo., for plaintiff.

Daniel W. Jackson and Jeffrey W. Wilkinson, Bradley, Arrowsmith & Jackson, Salt Lake City, Utah and Timothy G. Williams, Guy, Williams, White & Argeris, Cheyenne, Wyo., for defendants.

## ORDER RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT WITH FINDINGS

KERR, District Judge.

The above-entitled matter having come on regularly for hearing before the Court on plaintiff's motion for summary judgment and defendants' cross-motion for summary judgment; plaintiff appearing by and through its attorneys, Alan L. Sullivan, D. Thomas Kidd, and Molly Sommerville; defendants Mingo Oil Producers, Mike Strand, Lois Strand, Eleanor Strand, Neuman O. Petty, and Wayne Clark appearing by and through their attorneys, Daniel W. Jackson, Jeffrey W. Wilkinson, and Timothy G. Williams; and defendants David and Penelope Hammons appearing neither in person or by counsel, and the Court having heard the arguments of counsel and having carefully reviewed said motions, the briefs filed herein, the affidavits, and the exhibits and all matters pertinent thereto, and being fully advised in the premises, FINDS:

Jurisdiction is vested in this Court pursuant to 28 U.S.C. § 1332, as the plaintiff and defendants are citizens of different states and the amount in controversy exceeds $10,000, exclusive of interests and costs.

The plaintiff Champlin Oil Company (Champlin) is the owner of the mineral estate and surface rights of approximately 5,789.87 acres of land in Carbon County, Wyoming known as the Overland Dome Field. Said property is described as:

| | | Net Acreage |
|---|---|---|
| **Township 20 North, Range 84 West** | | |
| Section 13: | W/2, SE/4 | 480.00 |
| Section 23: | W/2, SE/4 | 480.00 |
| **Township 20 North, Range 83 West** | | |
| Section 7: | Lots 1(44.34), 2(44.34), 3(44.34), 4(44.34), E/2W/2, SE/4 | 497.36 |
| Section 15: | W/2, SE/4 | 480.00 |
| Section 17: | W/2, SE/4 | 480.00 |
| Section 19: | Lots 1(43.60), 2(43.60), 3(43.60), 4(43.60), E/2W/2, SE/4 | 494.40 |
| Section 21: | W/2, SE/4 | 480.00 |

|  |  | Net Acreage |
|---|---|---|
| Section 27: | W/2, SE/4 | 480.00 |
| Section 29: | W/2, SE/4 | 480.00 |
| Section 33: | W/2, SE/4 | 480.00 |
| Section 35: | W/2, SE/4 | 480.00 |

Township 19 North, Range 83 West

| Section 5: | Lots 3(39.05), 4(39.06), S/2NW/4, S/2 | 478.11 |
|---|---|---|
|  | Total | 5,789.87 acres |

Champlin originally leased said property to Amoco Production Company (Amoco) pursuant to an Oil and Gas Lease dated November 22, 1977. The lease was for a five year primary term and "as long thereafter as oil, gas or associated liquid hydrocarbons or any of them are produced from said land hereunder, or drilling or reworking operations are conducted thereon."

On January 10, 1978, Amoco entered into a farm-out contract with Classic Mining Corporation. Classic Mining Corporation thereafter, through a wholly-owned subsidiary, entered into a partnership referred to as the Overland Dome Petroleum Company (Overland) for the purpose of drilling and completing oil and gas wells on the Champlin-Amoco lease. Amoco later assigned some of its interests in the lease pursuant to the farm-out agreement to Classic, which then assigned those interests to Overland. Overland entered into a farm-out agreement with Mingo Oil Producers (Mingo) on November 24, 1981. Mingo agreed to finance and conduct the reentry and deepening of an existing well or drill a new well and thereby obtain an interest in the lease.

On April 27, 1982, creditors of Overland Dome filed an involuntary bankruptcy petition against Overland. On May 20, 1982 the Bankruptcy Court of the United States Court for the District of Utah entered an order of relief under Chapter 11 of the United States Bankruptcy Code. At approximately the same time, production operations in the field ceased and many wells were shut-in. The evidence shows that no electricity was provided to the Overland Field from March, 1982 until April 17, 1984; no production reports were filed with the Wyoming Oil & Gas Conservation Commission from March, 1982 until April, 1984; and no royalty payments were received by Champlin since June 1, 1982.

The trustee for the bankrupt Overland took exclusive possession and control of the lease premises during the time of the bankruptcy proceeding and apparently did not allow Mingo to go on to the leased property to continue drilling and reworking. The primary term of the lease expired November 22, 1982. On December 16, 1982, the trustee made a motion with the bankruptcy court to allow the trustee to use the bankruptcy estate's cash collateral to resume production on two wells on the lease. Two of the estate's creditors, both of which were companies controlled by defendant Mike Strand, opposed the use of the cash collateral for this purpose. The motion was ultimately denied.

About March 21, 1984, the trustee for Overland, without warranty, assigned its interest in the lease to Mingo, in exchange for cash and other consideration. The bankruptcy court approved this transfer of interest, but refrained from making any determination as to whether the lease had terminated. The court in fact noted that the lessor had taken the position that the lease had terminated. Champlin had filed a notice with the bankruptcy court which stated Champlin's position, that the lease had expired at the end of the primary term but that they might consider negotiations for extending the lease. Apparently some negotiations took place after Mingo had purchased Overland's interest, but were unsuccessful.

Champlin brought this action seeking declaratory relief that the lease had terminated and requesting injunctive relief that the defendants be prevented from entering on

to said premises. Defendants argue that the lease did not terminate because of the "free flow" of oil from some wells into the holding tanks which was sold at an alleged profit in April, 1984 constituting production (in paying quantities) sufficient to extend the lease into the secondary term. Defendants also claim that the bankruptcy proceedings constituted a condition excusing nonproduction under the terms of the *force majeure* clause and further that the plaintiff is estopped or has waived its right to terminate said lease. Finally, defendants have filed a counterclaim asserting liens on the leased property as a result of contracts for goods and services entered into with Overland.

This Court first addresses defendants' theory that the free-flow of oil constituted production sufficient to extend the lease beyond its primary term and notes there is a factual dispute as to whether the existence of oil in the tanks was actually the result of "free flow" or whether it had existed in the tanks since the time when active operations had ceased in the field.

■ Without regard to this factual issue, the Court finds and concludes as a matter of law that the "free flow" of oil, even if it had occurred during the period in question, could not constitute production or production in paying quantities. Where, as in this case, the lessee engaged in no productive activity and did nothing to produce, remove or sell the oil, gas, or associated hydrocarbons, there was no production within the meaning of paragraph 2 of the lease, as a matter of law.

The purpose of requiring production or "production in paying quantities" is "[t]o secure the development of the property for the mutual benefit of the parties." *Gulf Oil Corp. v. Reid,* 161 Tex. 51, 337 S.W.2d 267, 269 (1960). In no way can it be said that merely allowing free flowing oil to accumulate for approximately two years could constitute production as contemplated by the parties in entering into the lease.

The lease expired by its own terms on November 22, 1982, the end of the primary term, because no oil, gas, or associated liquid hydrocarbons were being produced and no drilling or reworking operations were being conducted on the leasehold property. *McClure v. Watson,* 490 P.2d 1059, 1061 (Wyo.1971).

Defendants claim that the *force majeure* clause of the contract excused nonproduction and prevented termination of the lease because the bankruptcy proceedings prevented the lessee or its assigns from producing or reworking any wells. The *force majeure* provision states in relevant part:

> All express or implied covenants of this lease shall be subject to all Federal and State laws, Executive Orders, Rules or Regulations, and this lease shall not be terminated, in whole or part, nor lessee held liable in damages, for failure to comply therewith, if compliance is prevented by, or if such failure is the result of, any such law, Order, Rule or Regulation, or if prevented by an act of God, of the public enemy, labor disputes, inability to obtain material, failure of transportation, *or other cause beyond the control of Lessee other than financial.* (Emphasis supplied.)

■ Plaintiff contends that the conditions which prevented production were financial in nature and, therefore, unexcused by the *force majeure* clause. The Tenth Circuit in the case of *In Re Trigg,* 630 F.2d 1370 (10th Cir.1980) held that an oil and gas lease expired automatically by its own terms when the bankruptcy trustee failed to pay a delay rental and that neither the bankruptcy code nor the bankruptcy court could have prevented the termination of the lease when the trustee failed to make a timely delay rental payment. While the case did not involve the application of a *force majeure* clause, we nonetheless believe it has bearing on the effect of bankruptcy proceedings generally on an oil/gas lease. While the bankruptcy proceedings were clearly outside the control of the lessee or its assigns, the very premise of such

proceedings are inherently the result of financial problems. Further, the trustee's inability to get two wells into production was the result of no available funds. Therefore, this Court concludes that the provisions of the *force majeure* clause are not available to extend the lease under the conditions of the present case.

■ Defendants contend there is an issue of fact as to whether Champlin was estopped or has waived its right to terminate the lease. This Court concludes as a matter of law that no reasonable minds could differ in finding that Champlin had not made any representations which defendants could have reasonably relied upon to purchase said lease interests. *Roth v. First Security Bank,* 684 P.2d 93, 96–97 (Wyo.1984); *Wood v. Trenchard,* 550 P.2d 490, 494 (Wyo.1976).

In fact, Champlin made it very clear in its notice filed with the bankruptcy court that Champlin took the position that the lease had expired. Champlin's indication that it was willing to negotiate was clearly not an offer to extend the lease.

■ Finally, defendant Mingo Oil Producers is not entitled under Wyoming law to assert any lien against plaintiff's interest in the subject property because (a) the liens claimed by defendant arose by reason of goods or services furnished to an owner of an estate less than a fee, and (b) plaintiff did not agree that its interest would be bound by any such lien. See Wyoming Stat.Ann. § 29–3–103(b) (1985); *Cities Service Oil Co. v. Pubco Petroleum Corp.,* 497 P.2d 1368, 1371–72 (Wyo.1972).

There being no material issue of fact, the matter is ripe for summary judgment. NOW, THEREFORE, IT IS

ORDERED that plaintiff's motion for summary judgment be, and the same is, hereby granted; it is

FURTHER ORDERED that defendants' cross-motion for summary judgment be, and the same is, hereby denied.